574 A.2d 951

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. BRYAN COYLE, DEFENDANT–APPELLANT.

Argued March 29, 1988—Decided June 11, 1990.

*Mark H. Friedman* and *Jacqueline E. Turner,* Assistant Deputy Public Defenders, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Boris Moczula,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Jeffrey L. Menkin,* Deputy Attorney General, of counsel and on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

A jury convicted defendant of the purposeful murder of Seth Lemberg, in violation of *N.J.S.A.* 2C:11–3a(1), and the unlawful possession of a weapon for an illegal purpose, contrary to *N.J.S.A.* 2C:39–4(a). Following a penalty-phase proceeding on the capital-murder conviction, the court sentenced defendant to death. On the illegal-possession offense, the court sentenced defendant to a term of ten years and imposed a Violent Crimes Compensation Board fine. Defendant's appeal of the capital-murder conviction comes to this Court as of right under *Rule* 2:2–1(a)(3). We conclude that there were errors in both the guilt and penalty phases. We therefore reverse and remand for a new trial.

I

–A–

Shortly after his release in 1983 from an eight-year prison term for murder, defendant, Bryan Coyle, moved to Old Bridge, where he assumed the name Bryan Johnson. He became a tenant in a one-family residence at 27 Morsell Place owned by Susan Dealy, whom he had known for "about three years, off and on," and her husband, Richard. In lieu of rent defendant made repairs on the house. Among his meager possessions were a nine-millimeter gun, bullets, a target resembling a person, and a customized holster. He put those items in a first-floor room where he occasionally slept in a sleeping bag.

In his free time Coyle practiced shooting with his nine-millimeter gun in the woods behind his home. He also participated in "neighborhood activities" and developed a close friendship with his next-door neighbors Seth and Rhonda Lemberg. Coyle frequently joined the Lembergs on their porch for late-night socializing, drinking, and "shooting the breeze."

As time passed, defendant and Rhonda Lemberg drew closer. While Seth Lemberg was at work, Coyle would listen attentive-

ly as Rhonda discussed her unhappiness. She expressed distress over her parents' divorce and her own marital problems. She confided in Coyle that sometimes after drinking, Seth would beat her and their children. Rhonda also revealed that her husband had been convicted in 1975 for assaulting two police officers. She further disclosed that she feared Seth might eventually use a gun her father had left in the house.

The neighborly friendship that defendant had established with Rhonda soon ripened into an ardent love affair, with disastrous consequences.

–B–

The evening of July 28, 1983, began as many others had. While Seth was at work, Coyle and Rhonda engaged in sexual relations and then sat out on the Lemberg porch. Around midnight Seth returned from work with a six-pack of beer in hand and joined Rhonda and Coyle. As was their custom, the trio passed the time talking and drinking beer and whiskey. Within three hours Coyle and Seth had each consumed three to five beers and several shots of whiskey. In the early morning hours of July 29, the group disbanded and Coyle returned home.

At that point an argument erupted between Rhonda and Seth. Fearing that her husband might hit her, Rhonda left, walked down the street, and sat on a neighbor's curb for about twenty minutes. When she returned, she found the house locked. Because she had forgotten her key, she went next door to Coyle's house. Coyle attempted to soothe Rhonda by walking with her around the block for twenty to thirty minutes before returning with her to his house. According to Coyle, he had taken mescaline prior to Rhonda's arrival. Rhonda testified that she had known that Coyle had taken mescaline, and that she had taken some herself.

Shortly thereafter, Seth banged on Coyle's door and demanded that his wife return home. When no one opened the door, he

broke the front window, cutting his hand in the process. Coyle retrieved his nine-millimeter gun, loaded it, and put it in his back pocket before opening the door. Ignoring Coyle's efforts to placate him, Seth strode towards Rhonda as she and Coyle retreated towards the kitchen. When Coyle fired a warning shot into the floor, Seth fled.

Seth called the police to report that his neighbor had shot at him. Although the police arrived within five minutes, their response was too late to avert tragedy.

The ensuing events are in dispute. After calling the police, Seth apparently saw Coyle and Rhonda enter Coyle's car. According to Stanley Makson, who lived across the street, Lemberg ran out of his house with a "bath" towel wrapped around his hand. Amy Makson, Stanley's wife, observed that Seth had a "wad" of light-colored wrapping around his hand. Rhonda testified, however, that she had seen a gun, not a towel, in her husband's hand. Lemberg prevented the couple's escape by blocking Coyle's car with a discarded garage door. Rhonda told Coyle that "[Seth's] going to kill us." She then fled from the car and ran down the street.

Stanley Makson testified that Seth, who had seemed "steamed up," had pursued Rhonda. Coyle, still armed with his gun, stood alongside the car. Rhonda and Seth engaged in a heated exchange as they returned home. She "whiningly" pleaded with him, while he gestured with disgust towards Coyle's house. After telling Rhonda to go back to her boyfriend, Seth stomped into his own house.

Coyle and Rhonda then started walking down the block. Seth stormed out of the house moments later, somehow passed Coyle, and hurried after Rhonda. Coyle then chased Seth. Just as he passed the driveway of 17 Morsell Place, Coyle opened fire on Seth, who was approximately twenty feet away. The shots missed. As he neared the driveway at 15 Morsell Place, defendant fired another round, this time hitting Seth in

the leg. Stumbling to the ground near 13 Morsell Place, Seth crawled across the front lawn and hid behind a spruce tree.

Coyle followed Seth behind the tree and fired three more rounds. Two of those shots hit the victim, one in the back of the shoulder, the other in the back of the head. According to the neighbors, the entire chase was accompanied by rapid-fire gunshots. Guy Midgely, who lived at 13 Morsell, and Christine Miladinov, who lived next door to Midgely, heard "yelping" that sounded like a "yahoo" during or immediately after the shots were fired. Coyle quickly ran down the block, away from the crime scene and his house.

When he caught up to Rhonda, they walked to the school at the far end of their block. Shocked and dazed, Coyle then ran into the woods abutting Morsell Place until he reached Route 516. He called Susan Dealy from a pay phone to pick him up. Dealy drove Coyle to the Matawan train station. He took a train to New York and then caught a bus to South Carolina.

Meanwhile, the police arrived at the Lemberg house moments after the shooting. Noticing several drops of blood on the porch, two officers entered the house, where they found the Lemberg children asleep upstairs. Three other officers discovered Seth's body at 13 Morsell Place. The police also recovered eight shell casings—three near the body, one near the driveway of 13 Morsell Place, one in the driveway of 15 Morsell Place, and three in the driveway of 17 Morsell Place.

The officers spoke to neighbors and to Rhonda, who had returned home, and then proceeded to Coyle's house. When no one answered, the officers entered the kitchen through the back door. Finding the house vacant, the officers searched for papers identifying the resident. They discovered several envelopes with the name "Bryan Johnson," one envelope bearing the name "Bryan Coyle," and several leaflets apparently intended for "Richard Dealy."

After securing Dealy's consent for a search of the house, the police seized a gun-cleaning kit, a customized holster, a target,

a gun catalogue, a *Soldier of Fortune* magazine, silencer instructions, and three live rounds of nine-millimeter hollow-point bullets. They also discovered a bullet hole in the floor of the landing leading to the kitchen, a shell casing on the stairway, and bullet fragments beneath the landing.

After examining the victim's body the medical examiner, Dr. Marvin Shuster, concluded that Lemberg had been shot three times, once in the back of the left shoulder at close range, once in the lower left buttock, and once in the back of the head, slightly above the left ear.

–C–

After the police apprehended Coyle in Columbia, South Carolina, the Middlesex County Grand Jury indicted him for the purposeful murder of Seth Lemberg, in violation of *N.J.S.A.* 2C:11–3a(1) (count 1), and the unlawful possession of a weapon for an illegal purpose, contrary to *N.J.S.A.* 2C:39–4(a) (count 2).

The State notified defendant of its intent to prove two aggravating factors during the penalty phase: first, defendant had been convicted of another murder, *N.J.S.A.* 2C:11–3c(4)(a); second, the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind, *N.J.S.A.* 2C:11–3c(4)(c).

The State's and the defense's characterization at trial of the circumstances leading to Lemberg's death differed sharply. Relying primarily on the testimony of neighbors, the State theorized that Seth Lemberg had been executed and that Bryan Coyle, a munitions buff, was the executioner. It blamed the murder in part on Coyle's antisocial tendencies.

Although defense counsel admitted that Coyle had killed Lemberg, they disputed the State's characterization. They sought to show through the testimony of defendant and Rhonda Lemberg that Coyle had justifiably killed Seth in defense of Rhonda. They painted Coyle not as an executioner but as a protective lover and guardian angel. Defense counsel argued

in the alternative that the killing had not been purposeful because Coyle had been intoxicated.

The State's witnesses essentially verified the factual account of the killing already set forth. A ballistics expert confirmed Dr. Shuster's conclusion: in order to have caused the powder marks found in the shoulder area, Coyle must have been from twelve to twenty-eight inches away when he shot the victim in the shoulder.

The State introduced the *Soldier of Fortune* magazine, silencer instructions, and gun catalogue to show that Coyle had not acted in defense of Rhonda. Claiming that Coyle's munitions expertise bore on his state of mind, the State argued that Coyle was a man "mentally prepared to kill," not a reasonable man who had acted in defense of another.

The defense countered that the victim had been prone to violence. Rhonda testified that her husband had been acting irrationally on the fatal evening, and that she had been fleeing from him when she heard gunshots and footsteps behind her. As the footsteps drew closer, her husband grabbed her from behind by the neck. As she turned, she saw Seth. When he was shot in the leg moments later, he appeared enraged, grabbed his leg, and lurched toward her. As she ran away, she saw Seth "jerk himself up" before Coyle shot him again.

Coyle's testimony paralleled Rhonda's. He acknowledged his affair with Rhonda and his interest in weapons. He further testified that he had believed Seth was going to kill Rhonda; that he had "tried firing warning shots" as he ran behind her assailant; but that when Seth reached to "grab" Rhonda, he "didn't think [he] had any more time and * * * aimed a shot and fired and hit [Seth]." Defendant insisted that he had fired because he had been "convinced that [Seth] was going to kill Rhonda," and that he had shot the victim not to kill him but only "[t]o stop him from getting Rhonda."

On cross-examination Coyle conceded that after the first shot had hit Seth, Rhonda had no longer been in immediate danger.

He also admitted that the mescaline had made him "hyper-aware." He further acknowledged having told Rhonda that he was "very much against society and its rules."

Maryann McIntosh, a friend of the Lembergs, testified that shortly after the shooting Rhonda told her that she had initially lied to the police about the killing. Contrary to the initial account she had given the police, Rhonda told McIntosh that Seth had been attacking her. Mrs. McIntosh also testified that Rhonda was not easily manipulated, and that Coyle "cared" for the Lemberg children.

On cross-examination and in its rebuttal, the State attempted to show that Seth was a loving husband and father, and that Rhonda was easily manipulated by others. Susan Hopper, another friend of the Lembergs, and Barbara Velenzano, a former neighbor, testified that after the shooting Rhonda had said she feared Coyle might return to kill her. Ms. Hopper added that Rhonda had also told her that she was several houses away when Seth was shot. The State repeatedly emphasized that Rhonda's testimony conflicted with her earlier sworn statement, in which she had said Seth held not a gun but rather a paper towel in his hand, and that when Seth was shot, she had been about five or six houses away, not within arm's reach. The State then pointed out that Rhonda had been meeting regularly with Coyle prior to trial, each meeting allegedly followed by a change in her story that benefitted Coyle's defense. The State stressed that Rhonda still visited Coyle, loved him, and would lie for him.

Arguing that defendant was guilty of purposefully murdering Lemberg, the prosecutor suggested in his summation that the *Soldier of Fortune* magazine and silencer instructions demonstrated that Coyle was "mentally prepared to kill." According to the State, that evidence was consistent with Coyle's attitude in general: feeling "jilted by society," Coyle "was against all [its] rules."

The court charged the jury on purposeful murder (*N.J.S.A.* 2C:11–3a(1)), aggravated manslaughter (*N.J.S.A.* 2C:11–4a), reckless manslaughter (*N.J.S.A.* 2C:11–4b(1)), and passion/provocation manslaughter (*N.J.S.A.* 2C:11–4b(2)), as well as on the unlawful possession of a weapon. During its deliberations the jury twice requested an elaboration on the murder and manslaughter charges before convicting defendant of purposeful murder and the unlawful-possession offense.

No witnesses testified at the penalty phase. The State placed in evidence the testimony and physical evidence that the court had admitted in the guilt phase, plus a certified copy of defendant's 1975 murder conviction. The prosecutor argued for a finding of aggravating factors (4)(a) (previous conviction for murder) and (4)(c) (outrageously and wantonly vile murder involving depravity of mind). Defendant submitted four mitigating factors: defendant was under the influence of extreme mental or emotional disturbance, 2C:11–3c(5)(a); defendant's intoxication significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, 2C:11–3c(5)(d); the victim participated in conduct that resulted in his death, 2C:11–3c(5)(b); and any other factor relevant to the circumstances of the offense, 2C:11–3c(5)(h).

The jury returned a verdict finding both aggravating factors beyond a reasonable doubt. Although it concluded that the victim had participated in conduct resulting in his death, the jury rejected the other mitigating factors. The jury further determined that the aggravating factors outweighed the mitigating factor beyond a reasonable doubt. Based on those findings, the court sentenced Coyle to death.

## II

Defendant mounts a broad-based attack on his conviction and sentence. We address first an error in the jury charge that clearly requires reversal of the murder conviction on the basis

of our decision in *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988).

■ In *State v. Gerald, supra,* 113 *N.J.* at 69, 549 *A.*2d 792, we held that "a defendant who is convicted of purposely or knowingly causing 'serious bodily injury resulting in death' under *N.J.S.A.* 2C:11–3(a)(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty." Therefore, if the record provides a rational basis for a jury to convict a defendant of either purposely or knowingly causing death, or purposely or knowingly causing serious bodily injury that results in death, a court must instruct the jury to specify which, if any, of those findings forms the basis for a conviction. *Id.* at 92, 549 *A.*2d 792. Because this case was tried pre-*Gerald,* the trial court's instructions understandably did not distinguish between purposely or knowingly causing death and purposely or knowingly causing serious bodily injury resulting in death. Defendant argues that the court's failure to have issued a *Gerald* charge constitutes plain error.

■ A *Gerald* charge is warranted if the evidence provides a rational basis for the jury to find that the defendant intended to cause only serious bodily injury. Because this record meets that threshold, defendant was entitled to have the jury instructed that it could return a non-capital-murder verdict, and the court's failure to have delivered a *Gerald* charge amounts to reversible error.

The State contends that defendant was not entitled to a *Gerald* charge because it is "inconceivable" that "a series of close range gunshots from what defendant knew to be 'a pretty powerful weapon,' one shot of which [was] fired into the victim's head, could be intended to do anything but kill that individual." The Attorney General points to *State v. Rose,* 112 *N.J.* 454, 548 *A.*2d 1058 (1988), in which we rejected Rose's contention that the evidence justified an "aggravated man-

slaughter" charge because "a person firing a sawed-off shotgun into the abdomen of another at point-blank range necessarily is aware that 'it is practically certain' that such conduct will cause the victim's death." *Id.* at 484, 548 *A.*2d 1058.

Rose argued that his statement that he had "panicked" because he "did not want to get caught" with a sawed-off shotgun, 112 *N.J.* at 483, 485, 548 *A.*2d 1058, indicated that the shooting was accidental rather than intentional. *Id.* at 482, 548 *A.*2d 1058. We determined that in the absence of any evidence that defendant's "panic" somehow interfered with his awareness of the consequences of his act, a jury could not rationally conclude from Rose's statement that he had been merely reckless. *Id.* at 485, 548 *A.*2d 1058.

Whether Rose should have received a *Gerald* charge was neither raised nor addressed in *Rose,* which was decided before *Gerald.* That aside, we are satisfied that the evidence bearing on Coyle's intent is different both qualitatively and quantitatively from that in *Rose.* Coyle testified at length about his intent in firing at the victim. He said specifically that he had sought not to kill Seth but to use "whatever means available" to "stop him" from grabbing Rhonda. Defendant argues that he shot at Lemberg after the victim failed to respond to a series of warning shots fired into the air. That first shot was fired "to hit him. All I wanted to do was to hit him and disable him * * *." Defendant concluded that the first attempt had been unsuccessful when Lemberg started to "launch back off the ground" after a few brief "stumbling, wobbling gyrations." Defendant testified on direct examination about his state of mind during the next critical series of events:

Everything that I had tried didn't work, and I couldn't take anymore chances at that point.

Q. *Were you firing to kill him?*

A. *No.*

Q. *Why were you shooting?*

A. *To stop him.*

Q. *To stop him from what?*

A. *To stop him from getting Rhonda.*

Q. Was there anything else you thought you could do when you did that?

A. No.

Q. Why not?

A. Because, as I said, everything else had failed. I thought I had hit him with the first shot, but because he had started to go down, but he didn't go down, he didn't stay down, he came back up again. I couldn't think of anything else to do. I was out of options at that point. The only thing I could do was fire. *All I wanted to do was to stop him. I wasn't trying to kill him.* To be perfectly honest, I didn't care if he got killed at that point. As far as I was concerned at that point, my objective was to stop him from getting at Rhonda and whatever means available to do that, I was going to use. That's all I was concerned with, and I did it. (Emphasis added.)

And on cross-examination when the prosecutor asked Coyle specifically about having shot his victim in the back of the head, defendant responded:

A. I didn't—Mr. [Prosecutor], I fired a flurry of shots. When he launched himself I started firing. Where they hit I only know now. At that time I had no idea.

Q. And you know now that one of them hit him in the back and the other one hit him in the back of the head, correct?

A. Yes, I do, yes.

Q. Now, when you fired those additional shots were you still trying to hit him in the leg?

A. I wasn't trying to hit him in any specific area. I was just trying to stop him.

The foregoing testimony provided a sufficient basis for the jury to find that defendant had intended to cause serious bodily injury rather than to kill his victim. That conclusion is merely a permissible one, surely not the exclusive one. Although a jury might not agree with defendant's argument, defendant was entitled to have the jury decide the issue. The test is "whether there is room for dispute." *State v. Mauricio,* 117 *N.J.* 402, 415, 568 *A.*2d 879 (1990) (quoting *State v. Crisantos (Arriagas),* 102 *N.J.* 265, 285, 508 *A.*2d 167 (1986) (O'Hern, J., concurring in part, dissenting in part).

Not having the benefit of our *Gerald* opinion, this able and experienced trial judge inadvertently foreclosed the jury from making the critical choice between purposeful murder and serious-bodily-injury murder. Each time the court instructed the jurors on the definition of murder, it told them that the

"unlawful and purposeful killing of one person by another" is accompanied by a "conscious object to cause death or serious bodily injury resulting in death." It gave them the statutory definition of "serious bodily injury," told them that they "must find the defendant guilty of murder" if they found that he had "purposely caused death or serious bodily injury resulting in death," and explained that a penalty phase would follow "if the defendant is found guilty of committing the offense of murder" as the court had defined it. The verdict sheet simply asked the jurors if they found defendant guilty or not guilty of "murder."

The jury convicted defendant of murder "without specifying [or, indeed, being asked to specify] for which of the [two] distinguishable offenses he was convicted." See *Gerald, supra,* 113 *N.J.* at 92, 549 *A.2d* 792. Because the jury was not given the opportunity to make a finding for which the record provides a rational basis, namely, that defendant's purpose was to inflict serious bodily injury rather than death, we must reverse his murder conviction.

### III

Having determined that a new trial is necessary, we turn to those issues that are likely to recur on retrial.

### Jury Composition

Defendant challenges the jury-selection process. First, he claims that the Middlesex County Grand Jury selection procedures systematically exclude the cognizable class of blacks and Hispanics, in violation of both the state and federal constitutions. The record does not support those claims.

The equal-protection clause requires that grand- and petit-jury selection be "free from any taint of discriminatory purpose." *State v. Ramseur,* 106 *N.J.* 123, 215, 524 *A.2d* 188 (1987). The sixth amendment guarantees that petit jurors will be "drawn from pools that represent a 'fair cross-section' of the community," *ibid.,* (quoting *Duren v. Missouri,* 439 *U.S.* 357,

368 n. 26, 99 *S.Ct.* 664, 670 n. 26, 58 *L.Ed.*2d 579, 589 n. 26 (1979)), while state precedent applies the fair-cross-section requirement to grand-jury selection in certain cases. *Ibid.; State v. Porro,* 152 *N.J.Super.* 259, 265, 377 *A.*2d 950 (Law Div.1977) (fair-cross-section requirement applies in cases in which the right to indictment by a grand jury is constitutionally protected), *aff'd,* 158 *N.J.Super.* 269, 385 *A.*2d 1258 (App.Div.), *cert. denied,* 439 *U.S.* 1047, 99 *S.Ct.* 724, 58 *L.Ed.*2d 706 (1978).

To establish a *prima facie* equal-protection claim, a defendant must identify a constitutionally-cognizable group, prove substantial under-representation over a significant period of time, and "show discriminatory purpose, either by the strength of his [or her] statistical showing or by demonstrating the use of [racially-based] selection procedures to support the inference of discrimination raised by substantial underrepresentation." *State v. Ramseur, supra,* 106 *N.J.* at 215–16, 524 *A.*2d 188. The elements of a *prima facie* fair-cross-section claim are similar: a defendant must identify a constitutionally-cognizable group, show that the representation of that group has not been fair and reasonable over a period of time, and demonstrate that the under-representation resulted from systematic exclusion. *Ibid.*

■ Defendant fails to establish *prima facie* cases for his claims that the fair-cross-section requirement and his equal-protection right were violated because New Brunswick and Perth Amboy, which have the highest percentage of minority residents of any of the towns in Middlesex County, were under-represented on three jury panels in July 1983. Defendant neither provides, as was provided in *State v. Ramseur, supra,* 106 *N.J.* at 213–14 & n. 41, 524 *A.*2d 188, a geographical-inference study to determine whether jurors resided in a census tract with a high- or low-minority population nor conducted telephone surveys to determine the percentage of minorities on the jury lists. *Id.* at 213, 524 *A.*2d 188. At best defendant argues only that certain municipalities were under-represented, not that a cogni-

zable class of persons was excluded. *Cf. State v. Ramseur*, 197 *N.J.Super.* 565, 576, 485 *A.*2d 708 (Law Div.1984) (residents of particular municipality do not constitute a cognizable group), *aff'd in part, rev'd in part*, 106 *N.J.* 123, 524 *A.*2d 188 (1987).

Likewise, defendant has not satisfied the second prong of either test. He has shown neither that the under-representation was substantial over a significant period of time (equal protection) nor that the representation was unfair and unreasonable over time (sixth amendment). Defendant's claim focuses on three jury panels selected over a three-week period in July 1983. Whatever a significant period of time might be, it surely is not three weeks.

Moreover, defendant proves neither systematic exclusion (fair cross-section) nor discriminatory purpose (equal protection). Middlesex County jury panels are selected from voter-registration and motor-vehicle lists. We have found that procedure to be facially neutral. See *State v. Ramseur, supra,* 106 *N.J.* at 224, 524 *A.*2d 188. Defendant does not show that that selection procedure was applied here in a "non-neutral" or discriminatory manner.

■ Nor is there merit to defendant's claim that he was entitled to discovery of materials held by the Jury Commissioner regarding the selection process. Essentially, defendant contends that fundamental fairness calls for an order for discovery because constitutional rights are implicated. Defendant has not independently substantiated his claim of under-representation. Instead, with the use of a blanket discovery request, defendant sought to shift to the State the burden of demonstrating the validity of the jury-selection process. The trial court correctly denied his request.

### Voir Dire

Defendant argues that the *voir dire* was inadequate because the trial court asked "closed" questions, suggested "correct" answers to potential jurors, and failed to ask appropriate fol-

low-up questions. Although defendant claims that those inadequacies permeated the entire juror-selection process, he specifically challenges the questioning of four potential jurors.

Those rulings merit no extended discussion for guidance on retrial, given our in-depth treatment of a range of *voir-dire* issues in opinions handed down after this trial, particularly *State v. Williams*, 113 *N.J.* 393, 408–45, 550 *A.*2d 1172 (1988), and *State v. Hunt*, 115 *N.J.* 330, 347–64, 558 *A.*2d 1259 (1989).

### Suppression of Evidence

Defendant challenges the admission of the evidence seized during the warrantless search of his residence. The trial court's findings in several significant respects are not sufficient to permit resolution of the issue.

Although he concedes that exigent circumstances justified the initial entry into 27 Morsell Place, defendant contends that the officers' subsequent re-entry and thorough search of the premises were illegal. After learning that the Dealys owned the house, they secured Richard Dealy's consent for a search of the premises and seized several incriminating items.

The trial court denied defendant's motion to suppress the evidence. It concluded that because Dealy had "a key to the premises and unrestricted access thereto which he regularly exercised," he had authority to consent to the search.

A third party who "possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected" can consent to a search of them. *United States v. Matlock*, 415 *U.S.* 164, 171, 94 *S.Ct.* 988, 993, 39 *L.Ed.*2d 242, 250 (1974). Common authority arises not merely from a property interest, but from the "mutual use of the property by persons generally having joint access or control for most purposes * * *." *Id.* at 171 n. 7, 94 *S.Ct.* at 993 n. 7, 39 *L.Ed.*2d at 250 n. 7.

Because a landlord generally does not have authority to consent to a search of a tenant's premises, *Chapman v. United*

*States,* 365 *U.S.* 610, 81 *S.Ct.* 776, 5 *L.Ed.*2d 828 (1961); *State v. Scrotsky,* 39 *N.J.* 410, 189 *A.*2d 23 (1963), the trial court's finding that Dealy, like most landlords, had a key to the house is not relevant. *See State v. Hodges,* 287 *N.W.*2d 413 (Minn. 1979) (landlord who had key to premises did not have authority to consent to search). The trial court also failed to indicate whether, in referring to Dealy's access to the house, it was using the term "regularly" in the sense of "periodically" or in the sense of "frequently." The distinction is significant in this context. For example, proof that a landlord enters a house on the first Tuesday of every month has different implications from those to be drawn from proof of entry several times a week at various hours. The first might be within a landlord's traditional rights and duties and therefore not include the authority to consent to a search; the second might indicate that a landlord has such authority.

■ Moreover, the purpose of the entries is significant. Having the right to enter the premises for limited purposes does not give a landlord authority to consent to a search. *See Chapman v. United States, supra,* 365 *U.S.* at 616, 81 *S.Ct.* 776, 5 *L.Ed.*2d at 833 (right to enter rented house "to view waste" does not give landlord authority to consent to search); *Blanco v. State,* 438 *So.*2d 404, 405 (Fla.App.1983) (landlord's right to enter for "inspection purposes and in order to spray for infestations" did not authorize him to let police into apartment); *State v. Hodges, supra,* 287 *N.W.*2d at 414 (landlord did not have authority to consent to search of premises even though "[u]nder the terms of the written agreement, [he] * * * specifically retained the right to enter the premises at any reasonable time to view the premises, to make repairs, or to show them to other prospective tenants"); *cf. Stoner v. California,* 376 *U.S.* 483, 489, 84 *S.Ct.* 889, 893, 11 *L.Ed.*2d 856, 861 (1964) (hotel guest's implied permission to " 'such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties' " does not give hotel clerk authority to consent to search of the room) (quoting *United States v. Jeffers,* 342 *U.S.* 48, 51,

72 *S.Ct.* 93, 95, 96 *L.Ed.* 59, 64 (1951)); *Dotson v. Somers,* 175 *Conn.* 614, 402 *A.*2d 790 (1978) (landlord who had entered defendant's room to have sexual intercourse with him and to do his laundry did not have authority to consent to search of room). The record here does not adequately reveal the nature of Dealy's use of the premises.

▮ The trial court also suggested that Dealy and defendant had an unusual landlord-tenant relationship because "[t]here was no lease agreement and no monetary consideration passed * * *." Although it appears that the trial court did not expressly rely on those facts, it should not regard them as dispositive on retrial. A landlord does not acquire the authority to consent merely because the rental agreement is not reduced to writing or because the rent is paid in kind rather than in currency. *See People v. Escudero,* 23 *Cal.*3d 800, 807, 592 *P.*2d 312, 316, 153 *Cal.Rptr.* 825, 829 (1979) ("whether the tenant pays in money * * * or in services" is irrelevant to the landlord's authority to consent); *State v. Taggart,* 7 *Or.App.* 479, 482, 491 *P.*2d 1187, 1188 (1971) (landlord did not have authority to consent to a search of the premises even though tenant had an "oral month-to-month lease").

▮ If Dealy did have authority to consent to the house search, the police had the right to seize any evidence that was in plain view. *Arizona v. Hicks,* 480 *U.S.* 321, 326, 107 *S.Ct.* 1149, 1153, 94 *L.Ed.*2d 347, 354 (1987). It is unclear, however, whether authority to consent to entry would give Dealy authority to consent to the search of those possessions of defendant that were not in plain view. A third party who has common authority over the premises might nevertheless lack common authority over the items therein. *United States v. Poole,* 307 *F.Supp.* 1185 (E.D.La.1969) (host did not have authority to consent to search of guest's overnight bag); *State v. Johnson,* 85 *N.M.* 465, 513 *P.*2d 399 (Ct.App.1973) (third party cannot consent to search of effects within exclusive control of co-occupant); White, "The Fourth Amendment as a Way of Talking

About People: A Study of Robinson and Matlock," 1974 *Sup. Ct.Rev.* 165, 226 (court should determine whether the arrangement contemplated joint use of effects). The trial court did not determine whether the items seized were in plain view or in closed containers, nor did it address whether Dealy had authority to consent to a search and seizure of them. At a suppression hearing on retrial, the trial court should make specific findings for each item seized.

We do not decide here whether Dealy had authority to consent to the search of the house and effects. In determining the issue on remand, the trial court should make detailed findings concerning the nature and extent of Dealy's access to the house. Before the evidence may be deemed admissible, the court must find that his access to or use of or control over the premises exceeded that of most landlords. If the court finds that Dealy did have authority to consent to the house search, it should then determine whether the items seized were in plain view. For those items that were not, the trial court must make a separate determination about Dealy's authority to consent to the search and seizure of each.

### Evidentiary Rulings

At trial defendant sought to exclude the *Soldier of Fortune* magazine, the silencer instructions, the target, and the gun catalogue on relevancy grounds. The State advanced two bases for admission. It claimed first that the items were relevant to the purposefulness of defendant's conduct by showing his "ability to deliberately aim at and hit Lemberg from a distance."

Defendant's marksmanship is relevant to the State's theory that he intentionally maimed his victim first and then coldheartedly stalked his prey before deliberately firing the fatal shot into the victim's head. See *State v. Davis*, 96 *N.J.* 611, 619, 477 *A.*2d 308 (1984) (relevant evidence renders the desired inference more probable than it would be without the evidence).

Unlike a trained sharpshooter, a person unskilled in shooting a gun would probably lack the ability to try only to wound, but not to kill, someone from a distance. More likely a novice would simply aim the gun and hope that the shot hit some part of the victim's body.

 The question here, then, is whether the items at issue demonstrate that defendant was a good marksman. Defendant's ownership of the *Soldier of Fortune* magazine, the silencer instructions, and the gun catalogue does not demonstrate sharpshooter ability. Because it seems doubtful that those items would improve one's proficiency with a firearm, they are not admissible to show defendant's intention to wound his victim first. The target, however, might be admissible for that purpose if the State can show how it reflects on defendant's marksmanship. The State would have to show that defendant had used that target, or ones like it, to practice shooting.

 As a second ground for admission, the State argued that the items were relevant to counter defendant's claim that he had justifiably killed Lemberg to protect Rhonda, a legal defense that requires that the defendant reasonably believed that deadly force was necessary. *State v. Kelly*, 97 *N.J.* 178, 198, 478 *A.*2d 364 (1984); *N.J.S.A.* 2C:3–5.

There is no connection between defendant's ownership of weapons information and the reasonableness of his use of deadly force. The determination of the reasonableness of deadly force is objective. Neither defendant's marksmanship nor his ownership of the *Soldier of Fortune* magazine, the silencer instructions, and the gun catalogue bears on whether a reasonable person would have believed deadly force was necessary.

Nor are those items admissible to prove that defendant did not in fact believe that deadly force was necessary. According to the trial court, the items were relevant to

the question [whether] one who has perhaps more familiarity and more knowledge on the subject of guns, would that person who uses it or say fires it six,

seven or eight times, as alleged in this case * * * be acting purposefully or as perhaps one may be who may not have that experience may form a different belief and feel that more shots may be needed[.]

However, one need not read *Soldier of Fortune* to appreciate that "six, seven, or eight" gunshots can kill a person. The depressing reality is that anyone who watches the nightly television news or glances at a newspaper knows as much. Moreover, knowing what constitutes deadly force is different from knowing whether deadly force is necessary. Even if defendant's possession of the items indicates that he is learned in weaponry, his expertise does not make it more likely that he believed that non-deadly force was sufficient to protect Rhonda or that something short of killing Lemberg would fulfill his stated purpose. A non-expert would be just as able to assess the necessity of deadly force.

We therefore conclude that the *Soldier of Fortune* magazine, the silencer instructions, and the gun catalogue are not admissible either to prove that defendant intended to wound Lemberg before killing him or to disprove defendant's claim that he acted justifiably in the defense of Rhonda. We do hold, however, that the target might have limited relevance on the first ground if the State can show that it reflects on defendant's marksmanship. If the trial court does determine that it is relevant for that purpose, it should still consider whether the prejudicial effect of admission would outweigh the probative value. The admissibility of the target is subject, of course, to whatever conclusion the trial court makes on the legality of the search and seizure of that evidence. See *Suppression of Evidence, supra* at 215–218, 574 *A.*2d at 961–963.

### Prosecutorial Misconduct—Guilt Phase

Defendant submits that in his guilt-phase summation the prosecutor inappropriately suggested that the Lemberg children could not testify because they were too young. Although the State mentioned that it was unable to call the Lemberg children to the stand, it did not clearly imply that a

legal-age barrier prevented their appearance. The prosecutor stated:

I wasn't able to bring in the Lemberg children because they are too young. I would have liked to have them tell you how much they loved their father and how much he loved them and how much they miss him, but, who knows, by now their minds might even be poisoned by their mother, so I couldn't bring them in.

Reviewed in context, the prosecutor's comments indicate that the children did not testify because he feared their minds had been "poisoned," not because there was a legal barrier to their testifying. The record does not include, however, any offer of proof on the part of the State showing that the minds of the children had been "poisoned." On retrial the prosecution should not repeat the comment in the absence of the requisite proof. *See State v. Rose, supra,* 112 *N.J.* at 522, 548 *A.*2d 1058.

## *Jury Instructions*

### –1–

Defendant contends that the trial court's charge on purposeful murder was deficient in its failure to address the role of passion/provocation evidence. He argues that when there is evidence of passion/provocation, the State can prove murder only if it also proves the absence of reasonable provocation for the killing. The trial court did not clearly instruct the jury consistent with that principle.

 In New Jersey a purposeful killing can be either murder or passion/provocation manslaughter. *State v. Grunow,* 102 *N.J.* 133, 138–40, 506 *A.*2d 708 (1986). When the record contains evidence of passion/provocation, the State can obtain a murder conviction only if it proves beyond a reasonable doubt that the purposeful killing was not the product of passion/provocation. *State v. Powell,* 84 *N.J.* 305, 314, 419 *A.*2d 406 (1980). If there is sufficient evidence of passion/provocation, a trial court must instruct the jury that "to find murder it must be convinced beyond a reasonable doubt that the accused

did not kill in the heat of passion * * *." *State v. Grunow,* *supra,* 102 *N.J.* at 145, 506 *A.*2d 708.

█ The court below initially charged:

Murder is the unlawful and purposeful killing of one person by another. A person who commits a killing does so purposely when it is his conscious object to cause death or serious bodily injury resulting in death. That is, a person acts purposely if he means to act in a certain way or to cause a certain result. For the killing to have been purposeful the causing of death or serious bodily injury must have been within the design or contemplation of the Defendant.

The court then instructed the jury that if it found beyond a reasonable doubt that the killing was purposeful, it should convict defendant of murder. Nowhere in the initial charge concerning purposeful murder did the court refer to the State's burden of disproving passion/provocation beyond a reasonable doubt. The trial court's initial charge concerning purposeful murder failed to make clear that if there is evidence of passion/provocation, a jury cannot convict for murder without first finding that the defendant did not kill in the heat of passion.

Later in its charge the court did instruct the jury on the role of passion/provocation. Couched within its instruction on passion/provocation manslaughter, the court explained:

[I]f you find that there is evidence that the killing was done in the heat of passion resulting from reasonable provocation[,] the State must prove beyond a reasonable doubt that this was not so. If you are convinced beyond a reasonable doubt that the Defendant purposely caused [death] or serious bodily injury resulting in death without acting in the heat of passion upon reasonable provocation, then you must find the Defendant guilty of murder.

But after the initial charge on purposeful murder and before the above-quoted charge, the court instructed the jury that it need not consider the lesser-included offenses of aggravated manslaughter or manslaughter unless it determined that the State had failed to prove beyond a reasonable doubt the offense of murder. That instruction had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter. Thus, despite the evidence of passion/provocation in the record, the jury may have convicted defendant of murder simply by finding that "it [was] his conscious object to cause death or

serious bodily injury," without having considered the possibility of a manslaughter verdict. That finding is insufficient to convict a defendant of murder when there is evidence of passion/provocation; the jury must find both purposeful homicide *and* an absence of passion/provocation.

We imply no criticism of the trial judge's efforts here. He obviously gave careful thought and preparation to his jury instructions, which essentially mirrored the model jury charges. We need not rule now, however, on either the adequacy of the model charge in general or the merits of sequential charges in all cases. To be sure, a number of jurisdictions condone the use of "acquittal first" deliberations. See *United States v. Harvey*, 701 *F*.2d 800, 806 (9th Cir.1983); *United States v. Moccia*, 681 *F*.2d 61, 64 (1st Cir.1982); *Pharr v. Israel*, 629 *F*.2d 1278, 1281–82 (7th Cir.1980), *cert. denied*, 449 *U.S.* 1088, 101 *S.Ct.* 880, 66 *L.Ed.*2d 815 (1981); *State v. Wussler*, 139 *Ariz.* 428, 679 *P*.2d 74 (1984); *People v. Padilla*, 638 *P*.2d 15, 18 (Colo.1981); *People v. Boettcher*, 118 *A.D.*2d 65, 503 *N.Y.S.*2d 810, 813–15 (App.Div.1986), *aff'd*, 69 *N.Y.*2d 174, 513 *N.Y.S.*2d 83, 505 *N.E.*2d 594 (1987). Juries are consistently told not to consider the lesser-included offenses unless they first find the defendant not guilty of the greater offense. *See, e.g., State v. McAllister*, 211 *N.J.Super.* 355, 511 *A.*2d 1216 (App.Div.1986) (discussing jury-verdict sheet). There is nothing inherently wrong with a sequential charge. *State v. Zola*, 112 *N.J.* 384, 405–06, 548 *A.*2d 1022 (1988). Such charges assure that a jury renders "a just verdict by applying the facts to the law as it is charged." *Ibid.* (quoting *People v. Boettcher, supra,* 69 *N.Y.*2d at 183, 513 *N.Y.S.*2d at 87, 505 *N.E.*2d at 597). Indeed, there is nothing inherently wrong with the model charge for purposeful murder. Absent evidence of passion/provocation, sequential charges usually provide a framework for orderly deliberations. *State v. Zola, supra,* 112 *N.J.* at 405, 548 *A.*2d 1022.

In murder cases in which there is evidence of passion/provocation, however, a court must take additional care in

issuing clear instructions. In those cases a sequential charge coupled with an instruction that inadequately defines the elements of the greater offense, namely, murder, can mislead the jury. Such a charge is inadequate. In this case the failure to heed defendant's objection to the charge and to reinstruct the jury so greatly risked confusion as to amount to error. To avoid repetition of that error, we suggest that trial courts instruct jurors in the initial charge on murder about the effect of passion/provocation on an otherwise-intentional killing.

 Finally, we address the State's attempt to dismiss any deficiencies in the charge as harmless error. The State argues for the first time on appeal that because there was insufficient evidence here of provocation to warrant a manslaughter charge, the issue of passion/provocation should not have been submitted to the jury, and therefore defendant suffered no harm from the incorrect charge.

Because of the relatively low threshold for a charge on a lesser-included offense, see *State v. Crisantos (Arriagas), supra,* 102 *N.J.* at 278, 508 *A.*2d 167, we conclude that a passion/provocation manslaughter charge was warranted. The jury could have rationally concluded that defendant and Seth had engaged in a heated confrontation, which led to the firing of a warning shot; that Seth had obstructed the couple's escape and had chased his wife down the street; and that in an effort to protect Rhonda, defendant had pursued Seth and had fired randomly at him. Although that evidence might not conclusively establish the existence of passion/provocation, it does leave "room for dispute." *State v. Mauricio, supra,* 117 *N.J.* at 415, 568 *A.*2d 879 (quoting *State v. Crisantos (Arriagas), supra,* 102 *N.J.* at 285, 508 *A.*2d 167 (O'Hern, J., concurring in part, dissenting in part)). The error in failing to instruct the jury on the role of passion/provocation in purposeful murder is therefore not harmless.

-2-

Defendant next challenges the adequacy of the trial court's passion/provocation manslaughter charge. Although the court issued a passion/provocation manslaughter charge, defendant claims that the court erred in failing to tailor that charge to this Court's decision in *State v. Guido*, 40 *N.J.* 191, 191 *A.*2d 45 (1963). Specifically, defendant submits that the court's manslaughter charge should have provided that

[a] period of repeated ill treatment which could induce a homicidal response in a person of ordinary firmness, and which the accused reasonably believe[s] is likely to continue, will constitute provocation if the episodes of ill treatment culminated in a sudden episode of emotional distress which overwhelmed his reason, and when the killing occurred because of it and before there had passed a period of time reasonably sufficient for his emotions to yield to reason. If the recipient of the ill treatment was someone other than the defendant, then the course of ill treatment could constitute provocation only if you concluded that a person of ordinary firmness would have resorted to fatal force if such ill treatment to that third person were known to him.

Defendant contends that the foregoing charge was justified because Coyle knew about the abuse that Seth had inflicted on Rhonda.

Passion/provocation manslaughter has four elements, one of which requires that the provocation be adequate. , *State v. Mauricio, supra*, 117 *N.J.* at 411, 568 *A.*2d 879. Various types of provocatory conduct have been deemed adequate, and "battery, except for a light blow, has traditionally been considered * * * sufficiently provocative." *Id.* at 414, 568 *A.*2d 879. Thus, if the victim and defendant have engaged in a physical confrontation, a jury could rationally conclude that the killing was the product of passion/provocation. *Ibid.*

A person can be provoked by conduct that causes injury to a relative. *State v. Bishop*, 225 *N.J.Super.* 596, 543 *A.*2d 105 (App.Div.1988) (passion/provocation manslaughter charge warranted where defendant responded to brouhaha involving nephew); *Commonwealth v. Berry*, 461 *Pa.* 233, 238, 336 *A.*2d 262, 264 (1975) ("[t]hreatened or immediate infliction of serious injury upon a parent, spouse or child because of the relationship

of the parties and the expected concern of one for the well being of the other" can be sufficient provocation to support voluntary-manslaughter verdict). Moreover, a person can be provoked without having witnessed the assault on a victim. *Commonwealth v. Berry, supra,* 461 *Pa.* at 239, 336 *A.*2d at 265; W. LaFave & A. Scott, *Criminal Law* § 7.10, at 657–58 (2d ed.1986) (hereinafter *LaFave & Scott*) (words conveying information of a fact that would constitute adequate provocation had that fact been observed constitutes sufficient provocation). More recently commentators have suggested that a person need not be related to the victim to be adequately provoked. *LaFave & Scott, supra,* at 658. Because of the "modern tendency to leave questions of the reasonableness of a provocation to the jury," conduct that causes injury to a close friend can constitute sufficient provocation. *Ibid.*

In *Guido* a wife had killed her husband following a prolonged period of abuse. We held that a course of ill-treatment sufficient to prompt a homicidal response in a reasonable person can constitute adequate provocation. 40 *N.J.* at 211, 191 *A.*2d 45. We recognized "the undoubted capacity of events to accumulate a detonating force, no different from that of a single blow or injury." *Ibid.* Defendant urges us to extend *Guido* to encompass cases in which someone other than the defendant was the victim of the prolonged abuse culminating in a killing.

We need take only a short step from *Guido* to accept as reality that a third person can be provoked when a close friend suffers injury or abuse under circumstances that would constitute adequate provocation had the third person been the object of the abuse. "[T]he undoubted capacity of events to accumulate a detonating force, no different from that of a single blow or injury" exists in both situations. *State v. Guido, supra,* 40 *N.J.* at 211, 191 *A.*2d 45. No principled reason prohibits the application of passion/provocation where the abuse was inflicted over a period of time on one with whom the defendant shares a familial or similarly-close relationship.

During a discussion on the proposed charges, defense counsel argued that

Guido * * * talk[s] about the possibility of adequate provocation being based not on a momentary short-lived episode but rather on the cumulative effect of a series of episodes over a period of time.

\* \* \* \* \* \* \* \*

My position is that we have a comparable situation here that Mr. Coyle is entitled to vicariously, if you will, include in his reaction to what was going on on the street all of the information which he had received from Rhonda Lemberg concerning this man's conduct toward her even though he hadn't been present at the scene at the time.

At first the court was inclined to include *Guido* language in its charge, reasoning that "[t]he Guido logic is applicable to that situation in that way * * *." Following an objection on the part of the State, however, the court refused to issue a *Guido* charge. It observed that under *Guido*

a course of ill treatment which can induce a homicidal response in a person of ordinary firmness and which the accused reasonably believes is likely to continue should permit a finding of provocation. The Court, however, further said in taking this view we merely acknowledge the undoubted capacity of events to accumulate a detonating force no different from that of a single blow or injury. * * * The question is simply one of fact.

Concluding that "the question [was] simply one of fact" and that the standard model charge on passion/provocation manslaughter would adequately cover the elements of provocation, the court deleted the *Guido* language from its charge.

■■■ When there is evidence that the decedent has, in the past, consistently physically abused one with whom the defendant stands in close relationship, and that the defendant knows of that abuse, "the jury must be told that a finding of provocation may be premised on 'a course of ill treatment which can induce a homicidal response in a person of ordinary firmness and which the accused reasonably believes is likely to continue.'" *State v. Kelly, supra,* 97 *N.J.* at 219, 478 *A.*2d 364 (quoting *State v. Guido, supra,* 40 *N.J.* at 211, 191 *A.*2d 45). It "must be instructed 'to consider not only decedent's conduct and threats that night, but also his [or her] prior mistreatment.'" *State v. Kelly, supra,* 97 *N.J.* at 219, 478 *A.*2d 364

(quoting *State v. Lamb*, 71 *N.J.* 545, 551, 366 *A.*2d 981 (1976)). Absent a detailed instruction, a jury might not make an informed decision on the passion/provocation manslaughter issue. Because defendant was entitled to have the jury consider passion/provocation manslaughter, and because there was sufficient evidence to justify a jury instruction tailored along the lines of *Guido* and defendant's request, the omission of that instruction was erroneous. On retrial the court should give a *Guido* charge.

-3-

█ Defendant contends that the trial court erred in refusing to provide a specific instruction on the theory of imperfect self-defense. Our decision in *State v. Bowens*, 108 *N.J.* 622, 532 *A.*2d 215 (1987), disposes of the claimed right to an imperfect-self-defense charge. There we held that "the Code of Criminal Justice does not provide an independent category of justification, excuse, or mitigation under the concept of imperfect self-defense." *Id.* at 626, 532 *A.*2d 215. The trial court need not charge separately that "imperfect self-defense would serve to reduce murder to an unspecified degree of manslaughter." *Id.* at 637, 532 *A.*2d 215; *see also State v. Pitts*, 116 *N.J.* 580, 605-06, 562 *A.*2d 1320 (1989) (claim of imperfect self-defense does not mandate aggravated-manslaughter charge). The trial court's instructions on the capital offense properly encompassed only purposeful murder and the lesser-included offenses of aggravated manslaughter, reckless manslaughter, and passion/provocation manslaughter.

*Penalty Phase*

-1-

█ The trial court submitted a special-verdict form to the jury in the penalty phase that required unanimous agreement that a mitigating factor existed before the jury could weigh that factor against any aggravating factor. As is now clear

from our decision in *State v. Bey*, 112 *N.J.* 123, 159–61, 548 *A.*2d 887 (1988) (*Bey* II), handed down after the trial of this case, juror unanimity on the existence of mitigating factors is not necessary. Should another penalty-phase proceeding be required, the court will doubtless follow our recent death-penalty cases.

–2–

Defendant argues that the State's case was peppered with instances of prosecutorial misconduct. Because we reverse defendant's conviction and set aside the sentence on other grounds, we need not determine whether any conduct of the prosecutor would, standing alone, constitute reversible error. On retrial, however, the State would be well advised to pay heed to our recent pronouncements on prosecutorial misconduct in *State v. Williams, supra,* 113 *N.J.* at 446, 550 *A.*2d 1172 and *State v. Rose, supra,* 112 *N.J.* at 508, 548 *A.*2d 1058, both of which make clear that in a capital case we will give painstaking scrutiny to the prosecutor's conduct.

With that in mind, we focus here on the more offensive aspects of the prosecutor's conduct. Defendant contends that in the penalty phase the prosecutor inappropriately introduced a non-statutory aggravating factor, namely, the absence of defendant's susceptibility to rehabilitation in combination with defendant's evil character and prior record. The prosecutor's discussion of the aggravating factors is disconcerting at best.

Referring to Coyle's prior murder conviction (aggravating factor c(4)(a)), the prosecutor expressed the view that previous murderers have been rehabilitated. It is possible. History has seen it, but here's what really struck me about Bryan Coyle as a second murderer.

When he was paroled in 1983, February of 1983 from that first murder, in two months, just two months he was in a bar buying an illegal .9 millimeter handgun, loaded, fully loaded with hollow nose bullets, just two months after being paroled, and when he was paroled he had this attitude about society. * * * [H]e had somehow been jilted by society and he was against all of

society's rules. [This course of action and attitude] suggest[ ] that this is a man who refuses to live by society's rules.

\* \* \* \* \* \* \* \*

[I]n June of 1983 he violated another one of society's basic rules, and that's when he moved in on Seth Lemberg's wife and Seth Lemberg's family while Seth Lemberg was away at work. This is a man who has utter contempt for the rules. Utter contempt that the rules we all live by mean anything, and this is all part of what I'm asking you to consider when I talk about the two murders, because it's more than just the fact that a previous murder occurred before this one. When he gets out of jail prior to committing the second murder he already has utter contempt for all the rules we live by.

\* \* \* \* \* \* \* \*

[The] gun was a violation of his parole, he told you that. That gun was illegal. That gun was stolen. That gun had hollow nose bullets. Just two months after being paroled on that first murder charge, that tells you, ladies and gentlemen, that he didn't learn anything, at least nothing positive.

\* \* \* \* \* \* \* \*

By that first aggravating factor alone, ladies and gentlemen, the second murder, the total lack of rehabilitation—let me ask you this, let's assume you give Bryan Coyle a break. Let's assume you do not impose the death penalty. Can you really sit there confidently and say to yourself, well, he'll never do this again? Is there anybody who can be confident of that knowing what his attitude is, knowing how he reacted within just a couple of months after getting out of jail in the first murder? Can any one of you say he's going to turn out to be a good, productive citizen in jail and after jail? You can't, you can't, because when he got out of jail the first time he showed you what kind of a person he is. This man cannot be rehabilitated. It's not possible, based on the facts and the evidence that we have in this case. So, I say to you that based on the first aggravating factor alone, the fact that he has killed twice, you are entitled, you are justified and you probably should impose the death penalty.

That part of the prosecutor's summation is most troublesome. Quite apart from the statement, unsupported by any proof, that the weapon was "stolen," the prosecutor's reference to the alleged theft and illegal possession of the gun in order to persuade the jury to impose a death sentence was plainly inappropriate. The fact that defendant had previously committed criminal offenses (other than murder) is not an aggravating factor and cannot be considered as evidence of an aggravating factor. *State v. Moore*, 113 *N.J.* 239, 277, 550 *A.*2d 117 (1988). Moreover, the prosecutor's comments imply that Coyle has always been and always will be a dangerous person. There is

no room in a capital case for remarks that suggest "the need to protect society from crime." *State v. Ramseur, supra,* 106 *N.J.* at 321, 524 *A.*2d 188; *State v. Rose, supra,* 112 *N.J.* at 521, 548 *A.*2d 1058. A prosecutor's penalty-phase commentary should be confined to the aggravating and mitigating factors that the legislature has specified. *State v. Rose, supra,* 112 *N.J.* at 521, 548 *A.*2d 1058. The unlikelihood of rehabilitation is not a statutory factor, and any reference thereto is improper.

■ Later in his penalty-phase summation, the prosecutor impermissibly commented on the effect of the murder on the victim's family:

> Now, I can't help thinking about the Lemberg children * * *. They lost a loving father. They are condemned to be raised by a misguided mother, and you know when Mr. Byrne was telling you about the holidays that Bryan Coyle is going to be missing if he goes to jail, I thought, how ironic, and what about Seth Lemberg, what about the Christmases and Thanksgivings and the Easters and all the holidays that he's not going to be around for? What about when his children play little league baseball? What about when they make their communion and confirmation or whatever religious affiliation they are going to be involved with? What about when they get into high school and they come home with their tests and they are looking for a father to give them some guidance, some instruction and some encouragement, and what about when they graduate, and what about [when] they have to make their decisions on where to go to college, and what about when they get married, and what about when they have children of their own? Seth Lemberg is not going to be there to be a loving, guiding father.
>
> So, I find it difficult, I truly do. I find it difficult to sympathize with Bryan Coyle because he's not going to have an opportunity to be free, thank God for that, to be free to spend his holidays with his family, at least he'll be alive to spend his holidays. Seth Lemberg is dead. His children are deprived of what everyone, even the Defense witnesses told us, was a loving, caring father.

A prosecutor cannot comment on the effect of a murder on a victim's family in order to persuade the jury to impose the death sentence. *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987); *accord State v. Williams, supra,* 113 *N.J.* at 450–52, 550 *A.*2d 1172 (prosecutor cannot comment on irrelevant personal characteristics of victim to obtain death sentence). Such inflammatory comments serve only to prejudice the jury unduly against the defendant and to confuse its

deliberations on the aggravating factors. *State v. Williams, supra,* 113 *N.J.* at 452, 550 *A.*2d 1172.

██ Unfortunately the prosecutor made yet another ill-advised remark during his penalty-phase summation. In his zeal to counter defendant's reliance on the mitigating factor of intoxication, the prosecutor asserted that "a man who ingests illegal drugs into his system has to be held responsible for whatever he does under the influence of those drugs." That is an inaccurate statement of law. The legislature expressly provided that a defendant's inability to "appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law" because of intoxication is a mitigating factor. *N.J.S.A.* 2C:11–3c(5)(d). Moreover, that mitigating factor may be found even though a defendant is not intoxicated to a degree sufficient to constitute a defense. A prosecutor may not suggest that the jurors must hold a defendant accountable for the effects of intoxication.

–3–

██ Before trial the prosecutor gave notice of aggravating factor c(4)(c). Although the statutory language reads that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," the prosecutor gave notice of his intention to prove only "depravity of mind." Defendant argues that the evidence of depravity was not sufficient to warrant jury consideration of that factor. We disagree.

Since the time of this trial, several decisions have developed the contours of aggravating factor c(4)(c). In *State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188, we narrowed that factor to satisfy constitutional principles. Concluding that "the essence of the legislative concern is the defendant's state of mind," *id.* at 207, 524 *A.*2d 188, we determined that "torture" or "aggravated battery" could be found "if the defendant intended to cause, and did in fact cause, severe physical or

psychological pain or suffering to the victim prior to * * * death." *Id.* at 211, 524 *A.*2d 188. We interpreted "depravity of mind" as "mark[ing] society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose)." *Id.* at 209, 524 *A.*2d 188.

We then discussed when a trial court should instruct on the "depravity" element:

"Where the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing, the court shall instruct the jury on the meaning of depravity in this specific context." *Id.* at 211, 524 *A.*2d 188.

We have continued to adhere to and to refine the *Ramseur* definition of "depravity." In *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, the defendant argued that depravity of mind could not be proven "because the murder was not motiveless." *Id.* at 66, 549 *A.*2d 792. There the defendant had entered the victim's house, intending to steal a television set. During the commission of the robbery, the defendant struck the victim over the head with an old television set and then viciously stomped on his head, leaving a sneaker imprint on what remained of the victim's face. The defendant absconded with sixty dollars and two television sets.

Because the term "depravity" applies only to those murders that are entirely without motive, we held in *Gerald* that "where * * * greed, anger, revenge, or other similar motive is present, the depravity aspect of Section c(4)(c) should not be submitted to the jury." *Ibid.* The State had essentially conceded that the motive of the crime was robbery when it sought to prove the additional aggravating factor of murdering the victim during the commission of the felony. Because the murder was not motiveless, we concluded that there was insufficient evidence of depravity.

In *State v. Rose, supra,* 112 *N.J.* 454, 548 *A.*2d 1058, the defendant had shot a police officer at point-blank range. The only evidence of the defendant's motive was that he had "panicked and did not want to be caught with the shotgun." *Id.* at

531, 548 A.2d 1058. Apparently conceding that the defendant's fear of detection was the only motive, the State sought to prove that "the murder was committed for the purpose of escaping * * * apprehension * * * for another offense * * *." *Ibid.* (citing *N.J.S.A.* 2C:11–3c(4)(f)). We therefore concluded that the evidence was not sufficient to justify submitting factor c(4)(c) to the jury.

In *State v. Zola, supra*, 112 *N.J.* 384, 548 A.2d 1022, however, we reached a different conclusion. After having lost his job as caretaker of an apartment complex, the defendant killed a resident who had previously complained to the superintendent about the defendant's shoddy maintenance work. Although that evidence may have suggested that the killing was the product of revenge, we determined that "a properly charged jury *might* have concluded that the murder served no purpose * * * other than the desire to kill." *Id.* at 434, 548 A.2d 1022 (emphasis added). Thus, we concluded that the evidence justified submitting to the jury a charge on the "depravity" element of c(4)(c).

We recently reached a similar conclusion in *State v. Davis*, 116 *N.J.* 341, 561 A.2d 1082 (1989), in which the defendant had arranged to purchase a trailer from the victim, a friend of the defendant's family. The victim had loaned defendant money to facilitate the purchase. After calling the victim from a local tavern one evening, the defendant drove to her home. When she did not answer her door, defendant jimmied it open and then killed her. At the time of the murder, the defendant had not yet repaid the loan. Although that evidence could provide a motive for the killing, namely, revenge, we again surmised that "a jury might have concluded that the murder served no purpose other than the desire to kill." *Id.* at 376, 561 A.2d 1082.

The State argues here that "there was ample evidence from which the jury could reasonably conclude" that the killing was the product of a depraved mind:

> [T]he evidence revealed that Seth Lemberg was unarmed; defendant fired his first shot at Lemberg from behind at a distance of approximately [twenty] feet; the first bullet struck Lemberg at the top of his left thigh, passed through the large bone in his leg, and exited near the groin area; this wound caused Lemberg to collapse to the ground; there was a pause, and as Lemberg tried to crawl away defendant approached unhurried and fired a second time from between one and two feet away; this bullet entered Lemberg's left shoulder and traversed to the right, passing through both lungs and part of the spine * * * before exiting by the right shoulder; defendant administered the final shot to the back of Lemberg's head, behind the left ear; the last bullet passed through Lemberg's brain perpendicular to the entry wound, thus causing his death. [And] defendant yelped or shouted "yahoo" during the shooting.

Unlike the situation in *State v. Rose, supra,* 112 *N.J.* 454, 548 *A.*2d 1058, and *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, the State here did not concede that Coyle had any motive other than the sheer pleasure he derived from stalking and executing his maimed prey. Rejecting defendant's claim that he had acted to protect Rhonda, the State theorized that defendant was a societal rebel and that he had killed the victim simply because he resented the "rules of society" and because the victim had interfered with his plans. A jury could infer, as the State suggests, that defendant was a manhunter who fired to wound his prey, watched patiently as his prey scampered for cover, and then, relishing the victory, ecstatically "yahooed" as he made the kill. It could reject defendant's theory of the protective lover and conclude instead that the killing served no other purpose beyond the defendant's pleasure in the act. We cannot conclude as a matter of law that the killing did not demonstrate a "depravity of mind."

Because we have reversed defendant's conviction for murder, we need not now address the adequacy of the court's charge on aggravating factor c(4)(c). In the event a new penalty phase is required, the court will fashion its charge in accordance with our death-penalty decisions to date, keeping in mind as well our observations below concerning another c(4)(c) problem that cropped up for the first time at oral argument.

–4–

The State's pretrial notice of aggravating factor c(4)(c) asserted only that the murder involved "depravity of mind."

Although the notice did not include the "torture" or "aggravated battery" aspects of c(4)(c), the State now contends that it should be able to submit those elements to the jury.

The record clearly shows that the State's decision to limit its submission of c(4)(c) to "depravity" was conscious rather than inadvertent. During a discussion between the court and counsel on the proposed penalty-phase charges, the prosecutor referred specifically to the omission of "torture" and "aggravated battery" from the notice of aggravating factor c(4)(c): "I very purposely limited the alleged aggravating factor. I did not allege torture." And later in the penalty-phase proceeding the prosecutor shed light on the reason for the omission. In response to defendant's motion to strike aggravating factor c(4)(c), the prosecutor stated:

> I chose, when I prepared the aggravating factors, to leave out torture because I think, strictly speaking, strictly speaking that was not a descriptive word, it was not a good word, it was not a good word to use in terms of what happened in this situation. Nor were the words aggravated battery. I thought depravity of mind, one of the three choices provided by the Statute, most clearly described what happened here.

We must now decide whether the State's conscious choice to submit only the "depravity" element to the jury is binding on retrial.

Each element of aggravating factor c(4)(c) is distinct and stands on its own for purposes of satisfying that factor. *See Ramseur, supra*, 106 *N.J.* at 211, 524 *A.*2d 188. The State's knowledge of the disjunctive nature of aggravating factor c(4)(c) at the time of trial is apparent from the record. In his motion to strike aggravating factor c(4)(c), defendant argued that the State could submit that factor to the jury only if it had offered, which it had not, proof of "torture" and "aggravated battery" as well as "depravity." The State responded with the argument that we ultimately accepted in *Ramseur*: under the death-penalty statute, proof of any one of the elements satisfies aggravating factor c(4)(c); in essence each element of that factor is a separate aggravating factor.

Here the State neither alleged nor argued that the facts supported a finding on the "torture" and "aggravated battery" elements. The State's belated contention that those elements are supported by the facts is essentially an attempt to introduce new aggravating factors at retrial. In *State v. Biegenwald*, 110 *N.J.* 521, 542 *A.2d* 442 (1988) (*Biegenwald* III), we dealt with the State's right to submit new aggravating factors under circumstances similar to, but in one critical respect different from, those in this case.

In its prosecution of Biegenwald for the murder of Anna Olesiewicz, the State alleged aggravating factor c(4)(a) on the basis of a 1959 murder conviction. On appeal we affirmed the defendant's murder conviction but reversed the death sentence because of penalty-phase errors. *State v. Biegenwald*, 106 *N.J.* 13, 53–67, 524 *A.2d* 130 (1987) (*Biegenwald* II). While that appeal was pending, the defendant was convicted in 1984 for the murder of William Ward. In the new penalty phase on the Olesiewicz murder, the State sought to rely on both the Ward and the 1959 murder convictions to satisfy aggravating factor c(4)(a). We decided that the State would be permitted to submit the Ward conviction, which could be viewed as a new aggravating factor, on retrial. *Biegenwald* III, *supra*, 110 *N.J.* at 540–41, 542 *A.2d* 442. The State could not have used that conviction in the first trial because Biegenwald had not been convicted of the Ward murder at that time; that evidence was nonexisting and therefore undiscoverable. The State here, however, had no such problem; it had the evidence and knowledge of the "torture" and "aggravated battery" elements, and simply failed to allege and submit those elements.

Fundamental-fairness and double-jeopardy concerns impinge on the State's right to submit aggravating factors on retrial. We need not, however, consider double-jeopardy implications here because fundamental fairness bars the State from asserting "torture" and "aggravated battery" on retrial. Fundamental fairness dictates that "the State with all the resources and power at its command should not be permitted to make re-

peated attempts to convict a person for the same offense * * *." *Biegenwald* III, *supra*, 110 *N.J.* at 541, 542 *A.*2d 442. Because of the stakes involved in a capital case, we compel the State "to offer all its proofs of any applicable aggravating factor against the defendant at his or her first trial." *Ibid.* Unless the State proves "that it has discovered new evidence sufficient to establish at resentencing a new aggravating factor and that such evidence was unavailable and undiscoverable at the original trial despite the State's diligent efforts," *id.* at 542, 542 *A.*2d 442, it cannot submit that new evidence at retrial.

The State is not seeking here to submit new evidence on a new aggravating factor, but rather is relying on old evidence to satisfy a new aggravating factor. Fundamental-fairness concerns do not dissipate in that situation. If the State knew the facts and failed to allege an aggravating factor on the basis of those facts at the first trial, it should not thereafter be able to submit that factor to the jury on retrial. *Cf. State v. Gregory,* 66 *N.J.* 510, 333 *A.*2d 257 (1975) (State should join all offenses based on same conduct); *State v. Godfrey,* 139 *N.J.Super.* 135, 141, 353 *A.D.*2d 101 (App.Div.) (if State knew of facts but brought charges under wrong statute, later prosecution under correct statute barred), *certif. denied,* 73 *N.J.* 40, 372 *A.*2d 306 (1976). Unlike *Biegenwald* III, the State knew of both the facts and law here. That knowledge distinguishes this case from *Biegenwald* III. Having chosen to omit the "torture" and "aggravated battery" elements of c(4)(c) at the trial, the State has waived them and cannot on retrial submit them to the jury.

–5–

 In any new penalty-phase proceeding the jury can consider Coyle's 1974 *non vult* plea to murder in an aggravating-factor-c(4)(a) determination. As *State v. Ramseur* explains, 106 *N.J.* at 272, 524 *A.*2d 188, the legislature intended that *non vult* murder pleas be used in support of that aggravating factor. Furthermore, there can be little doubt about the reliability of that plea. Defendant did not enter the plea to insulate

himself from a possible death sentence, because the capital-punishment statute was not on the books at that time.

## IV

The judgment of conviction for capital murder is reversed and the cause remanded for a new trial consistent with this opinion.

HANDLER, J., concurring in part and dissenting in part.

In this case defendant was convicted of the purposeful murder of Seth Lemberg, in violation of *N.J.S.A.* 2C:11–3a(1), and the unlawful possession of a weapon for an illegal purpose, contrary to *N.J.S.A.* 2C:39–4(a). Following a penalty-phase proceeding on the capital-murder conviction, defendant was sentenced to death. The Court finds error in both the guilt phase of the trial and in the penalty proceeding, reversing the conviction and death sentence, and remanding for a new trial. I concur in its judgment.

I write separately to deal more fully with several important issues. These relate to the jury instructions concerning the homicide itself; the admissibility of evidence during the guilt phase; the prejudicial effect of prosecutorial misconduct; and the sufficiency of the evidence of a sadistic or senseless killing as support for the aggravated factor, c(4)(c).

In addition, I repeat my strong belief that the Capital Murder Act, *N.J.S.A.* 2C:11–3, is unconstitutional as enacted, construed, and applied. In view of the evolving nature of death-penalty jurisprudence, I feel that this position remains tenable. *See, e.g., State v. DiFrisco*, 118 *N.J.* 253, 284, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part). These reasons impel me to record my dissent from the Court's judgment.

## I.

The Court rules in this case, as in *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988), that the jury convicted this defendant without specifying, or being asked to specify, whether he was guilty of knowing or purposeful murder or of serious bodily injury resulting in death. I agree with the Court that because a rational basis existed in the record for a finding "that defendant's purpose was to inflict serious bodily injury rather than death," his conviction for murder must be reversed. *Ante* at 212, 574 *A.*2d at 960.

I also agree with the Court that the charge on purposeful murder was fatally flawed. The Court aptly defines the problems engendered by inconsistent charges, some correct and some incorrect, and by the sequence in which greater- and lesser-included offenses were presented to the jury for its determination.

The incorrect parts of the charge advised the jury that once a purposeful killing was shown it was murder and once murder was found no consideration of the lesser-included offenses was required. The Court criticizes the charge "concerning purposeful murder" because it "failed to make clear that if there is evidence of passion/provocation, a jury cannot convict for murder without first finding that the defendant did not kill in the heat of passion." *Ante* at 222, 574 *A.*2d at 965. This error undercut the defendant's right to have the jury properly consider all defenses to the murder charge. The trial court's charge also suggested that certain offenses need not be fully considered. The Court notes that the trial court's charge included the instruction that the jury "need not consider the lesser-included offenses of aggravated manslaughter or manslaughter unless it determined that the State had failed to prove beyond a reasonable doubt the offense of murder." *Ante* at 222, 574 *A.*2d at 965. The Court correctly infers that "[t]hat instruction had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful kill-

ing from murder to manslaughter." *Ibid.* I agree with the Court's conclusion:

[D]espite the evidence of passion/provocation in the record, the jury may have convicted defendant of murder simply by finding that "it [was] his conscious object to cause death or serious bodily injury," without having considered the possibility of a manslaughter verdict. That finding of a purposeful killing alone is insufficient to convict a defendant of murder when there is evidence of passion/provocation; the jury must find both purposeful homicide *and* an absence of passion/provocation. [*Ibid.*]

The Court implicitly—and, in my view, properly—rejects the State's contention that there was no reversible error in the charge as a whole because the sentencing verdict sheet gave equal weight to the three potential verdicts under Count One and because parts of the charge correctly stated the law. While parts of the charge were correct and the verdict sheets did not repeat the error of requiring a jury to find defendant guilty of murder for any purposeful killing, it is not clear that these correct instructions adequately countered the repeated errors in the charge. *See Francis v. Franklin,* 471 *U.S.* 307, 322, 105 *S.Ct.* 1965, 1975, 85 *L.Ed.*2d 344, 358 (1985); *see also Cabana v. Bullock,* 474 *U.S.* 376, 383 n. 2, 106 *S.Ct.* 689, 695 n. 2, 88 *L.Ed.*2d 704, 714–15 n. 2 (1986) (a second and correct instruction that was contrary to the first instruction did not cure the error created by the erroneous first instruction).

This flaw in the trial court's charge overlaps another deficiency, that relating to the substantive standard defining legal provocation as a defense to intentional murder. At trial, defense counsel proposed that the theory of provocation based on *State v. Guido,* 40 *N.J.* 191, 191 *A.*2d 45 (1963), should be included within the instructions to the jury. This case, in my view, justifies the need, particularly in a capital-murder prosecution, to recognize a broad standard of passion/provocation as a defense to purposeful or knowing murder. The Court now does so.

Recently this Court expansively interpreted the standard defining passion/provocation. *State v. Mauricio,* 117 *N.J.* 402, 410–13, 568 *A.*2d 879 (1990); *cf. State v. Crisantos (Arriagas),*

102 *N.J.* 265, 508 *A.*2d 167 (1986) (the evidence must minimally disclose a rational basis for a jury to find passion/provocation). The evidence in this case generated inferences that defendant acted in an emotional state actuated by provocation relating to his paramour, the victim's wife. Our standard of legal passion/provocation, particularly in a capital-murder case, should recognize the relevance of such evidence. This is, moreover, consistent with the philosophy that in a capital-murder prosecution the jury should be presented with all homicide offenses reasonably suggested by the evidence.

Defendant also argues that the sequential order in which the trial court told the jury they must consider the offenses constituted reversible error. Defendant contends that the trial court's instruction that the jury must first consider murder and then the two forms of manslaughter constitutes reversible error because it did not reflect the statutory scheme for unlawful killings in New Jersey. The jury, according to defendant, should not be required to consider these different forms of unlawful killings in a consecutive order simply because the two types of killings are distinguishable, but rather the jury should consider reckless and aggravated manslaughter together, and purposeful or knowing murder with passion/provocation manslaughter. The issue is further complicated by the addition of so-called serious-bodily-injury murder, as defined under *Gerald,* which partakes of some of the aspects of purposeful or knowing murder and some of the aspects of manslaughter. I believe that the trial court's requirement that the jury consider the differing unlawful killing charges in a strict hierarchy constituted reversible error. As the case was tried, this charge induced or coerced the jury's deliberations by foreclosing or inhibiting adequate consideration of lesser-included offenses and deprived defendant of his right to have the lesser-included offense of passion/provocation manslaughter fully and fairly considered.

The State refers to out-of-state and federal cases, in which courts have approved of such a hierarchical charge, *see* 2 Devitt

& Blackmar, Federal Jury Instructions section 18.05, which sets up a strict priority according to which the jury must first find defendant not guilty of the greater offense in order to turn to the lesser offenses. *See, e.g. United States v. Harvey*, 701 *F*.2d 800, 806 (9th Cir.1983), *reh'g den.*, 711 *F*.2d 144 (9th Cir.1983); *United States v. Moccia*, 681 *F*.2d 61, 64 (1st Cir. 1982); *Pharr v. Israel*, 629 *F*.2d 1278, 1281–82 (7th Cir.1980), *cert. den.* 449 *U.S.* 1088, 101 *S.Ct.* 880, 66 *L.Ed.*2d 815 (1981); *State v. Wussler*, 139 *Ariz.* 428, 679 *P*.2d 74 (1984); *People v. Padilla*, 638 *P*.2d 15, 18 (Colo.1981); *People v. Boettcher*, 118 *A.D.*2d 65, 503 *N.Y.S.*2d 810, 813–15 (App.Div.1986), *aff'd* 69 *N.Y.*2d 174, 513 *N.Y.S.*2d 83, 505 *N.E.*2d 594 (1987). In these cases, also noted by the Court, *ante* at 222–223, 574 *A.*2d at 965–966 the courts approved instructions which required the jury first to consider the greater offense and either acquit on that offense or be unable to agree on the greater offense before considering a lesser offense. *Cf. People v. Mays*, 407 *Mich.* 619, 288 *N.W.*2d 207, 211–12 (1980) (instructions cannot foreclose a jury's consideration of lesser included offense if they have not reached agreement on the greater offense because that requirement has coercive effect); *State v. Ogden*, 35 *Or.App.* 91, 580 *P*.2d 1049, 1052 (1978) (same).

We have consistently recognized that a jury should not be either directly or subliminally conditioned to reach a particular verdict. *State v. Simon*, 79 *N.J.* 191, 206–08, 398 *A.*2d 861 (1979); *see State v. Collier*, 90 *N.J.* 117, 122–23, 447 *A.*2d 168 (1982). The hierarchical charge has a clear capacity to encourage the jury to determine guilt because the jury must acquit before turning to lesser-included offenses. Because the jury must first find a defendant not guilty of the greater offense, such a charge may coerce the jury and limit its freedom to consider lesser-included offenses. The Court acknowledges but does not resolve this serious problem. It merely observes:

We need not now rule on either the adequacy of the model charge in general or the merits of sequential charges in all cases. To be sure, a number of jurisdictions condone the use of "acquittal first" deliberations. [Citations

omitted.] Juries are consistently told not to consider the lesser-included offenses unless they first find defendant not guilty of the greater offense. *See, e.g., State v. McAllister,* 211 *N.J.Super.* 355 [511 *A.2d* 1216] (App.Div.1986) (discussing jury-verdict sheet). * * * Indeed, there is nothing inherently wrong with the model charge for purposeful murder. Absent evidence of passion/provocation, sequential charges usually provide a workable framework for orderly deliberations. [Citation omitted.]

In murder cases in which there is evidence of passion/provocation, however, a court must take additional care in issuing clear instructions. [*Ante* at 223, 574 *A.*2d at 965–966.]

In capital cases the court should not only give the jury the most complete range of verdict choices covering possible homicide offenses, but also assure it the widest opportunity to determine guilt and decide which offense, if any, is justified by the evidence. *See, e.g., State v. Rose,* 112 *N.J.* 454, 566, 548 *A.*2d 1058 (1988) (Handler, J., dissenting). The hierarchical charge goes against this grain. The hierarchical submission of offenses under which the jury is required to find defendant not guilty of a greater offense before considering lesser-included offenses serves to narrow the range of available choices and reduce the capacity to determine guilt. *People v. Mays, supra,* 407 *Mich.* 619, 288 *N.W.*2d 207, 211–12; *State v. Ogden, supra,* 35 *Or.App.* 91, 580 *P.*2d 1049, 1052. This concern is critical in a capital-murder case where a determination of the greater offense, intentional murder, will automatically expose defendant to the death penalty. If the jury has not fully and objectively been able to reach this conclusion, because its deliberations on lesser-included offenses have been short-circuited, the defendant will have been unfairly brought closer to a death sentence. The court should by its instructions give the jury an order in which offenses are to be considered but specifically allow the jury to consider lesser offenses before it has determined guilt on the greater offense.

## II.

Defendant argues that four pieces of evidence seized by police during their search of 27 Morsell Place should not have been admitted because they were not relevant, and if relevant

were impermissible character evidence and/or substantially more prejudicial than probative. The four challenged pieces of evidence are a *Soldier of Fortune* magazine, silencer instructions, a gun catalog, and a target.

State of mind was a relevant issue with respect to the charge of purposeful murder under *N.J.S.A.* 2C:11-3a(1) because the defendant was alleging intoxication prevented him from forming this mental state and presented evidence that could have supported a verdict of reckless or aggravated manslaughter. Defendant's state of mind was also at issue with respect to the defense-of-others claim under *N.J.S.A.* 2C:3-5. The Court holds that the four seized pieces of evidence (with the possible exception of the target) were not sufficiently relevant to the defendant's state of mind and, further, were used impermissibly to prove that defendant had an evil character. *Ante* at 220-221, 574 *A.*2d at 964. The Court rules that it was error to admit this evidence. *Ibid.* I concur in this result.

In the guilt-phase summation, the prosecutor focused upon the magazine, the target, the silencer instructions, and the catalog ostensibly to argue that they showed defendant's state of mind at the time of the murder. The prosecutor stressed that the main theme of the magazine was "weapons and how to use them," pointed to the advertisements that defendant had circled, and then noted the silencer instructions and how silencers were used to kill without detection, in arguing that these demonstrated that defendant was "mentally prepared to kill." According to the State, that evidence was consistent with defendant's attitude in general: feeling "jilted by society," he "was against all [its] rules."

It seems clear that, notwithstanding the State's contention that the prosecutor was commenting upon defendant's state of mind, the prosecutor was actually using the evidence to portray defendant as an evil person who, consistent with this character, killed another. Admission of evidence for that purpose is plainly in violation of *Evidence Rule* 47. Furthermore, it

emerges rather starkly that the State's use of this evidence was to prove "disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion." *Evid.R.* 55.

The case of *People v. Zackowitz,* 254 *N.Y.* 192, 172 *N.E.* 466 (1930) is instructive. There, Justice Cardozo noted that, "[a]t trial the vital question was the defendant's state of mind at the moment of the homicide." *Id.* 172 *N.E.* at 467. The court found that the admission of certain evidence constituted reversible error, stating:

> Almost as the opening of the trial the people began the endeavor to load the defendant down with the burden of an evil character. He was to be put before the jury as a man of murderous disposition. To that end they were allowed to prove that at the time of the encounter and at that of his arrest he had in his apartment, kept there in a radio box, three pistols and a tear-gas gun. There was no claim that he had brought these weapons out at the time of the affray, no claim that with any of them he had discharged the fatal shot. He could not have done so, for they were all of different caliber. The end to be served by laying the weapons before the jury was something very different. The end was to bring persuasion that here was a man of vicious and dangerous propensities, who because of those propensities was more likely to kill with deliberate and premeditated design that a man of irreproachable life and amiable manner. * * * In such circumstances, ownership of the weapons, if it has any relevance at all, has relevance only as indicating a general disposition to make use of them thereafter, and a general disposition to make use of them thereafter is without relevance except as indicating a "desperate type of criminal," a criminal affected with a murderous propensity. [*Id.* at 467–68.]

The admission of that evidence constituted reversible error because "[t]he law is not blind ... to the peril to the innocent if character is accepted as probative of crime." *Id.* at 468. As in *Zackowitz,* the key issue in this case was the defendant's state of mind at the time of the shooting. The seized evidence, however, was used not to show defendant's state of mind at the time of the shooting, but to demonstrate that he was a "walking, ticking time bomb" who was "mentally prepared to kill" and that he was "a very, very dangerous, evil man." In short, the prosecutor was using this evidence to portray defendant's character as homicidal.

It should be noted that the trial court here issued neither limiting nor curative instructions. Curative instructions were given as part of the charge to the jury after defendant had specifically objected to these comments by the prosecutor in his motion for mistrial. The curative instructions, however, did not specifically refer to the improper comments and require that the jury disregard them, but rather mentioned only general directions concerning the jury's role in considering evidence. *See State v. Farrell,* 61 *N.J.* 99, 103, 106–07, 293 *A.*2d 176 (1972). These instructions were, in short, ineffective.

The defendant also argues that, even if the trial court found that the evidence was not impermissible character evidence and that it was relevant, the court's determination on *Evidence Rule* 4 constitutes reversible error. This challenge requires defendant to show that the trial court's decision to admit the gun catalog, magazine, silencer instructions, and target was in error because the probative value of this evidence with respect to defendant's state of mind "is substantially outweighed by the risk that its admission will ... (b) create substantial danger of prejudice or of confusing the issues or of misleading the jury." *Evid.R.* 4.

I would find the trial court's ruling under *Evidence Rule* 4 constituted a "palpable abuse of discretion." Assuming the evidence was relevant to defendant's state of mind, it also clearly and indisputably tended to prove defendant's character. In this latter capacity it had no legitimate probative worth in this trial. In my estimation, the prejudicial effect of this evidence totally eclipsed its probative worth in establishing guilt.

Even if its potential prejudice as impermissible character evidence did not substantially outweigh the probative worth of the evidence with respect to defendant's state of mind and ultimate guilt, the balancing under *Evidence Rule* 4 should not have stopped there. This evidence was not only available to prove defendant's guilt. It was equally available in the sen-

tencing phase of defendant's prosecution. Despite its bifurcated structure, a capital murder prosecution is effectively a continuous procedure that includes both the trial to determine guilt and, consequently, eligibility for a death sentence as well as the trial that results in the imposition of sentence. *See State v. Moore*, 113 *N.J.* 239, 312, 550 *A.*2d 117 (1988) (Handler, J., concurring). The prejudicial taint of this highly inflammatory evidence had the clear capacity to spread beyond the guilt trial itself. Because a capital-murder prosecution, as currently conducted, proceeds before the same jury on a continuous, albeit sequential, basis and because evidence from the guilt trial is recycled in the penalty trial, the prejudicial impact of proffered testimony on the determination of sentence must be included in any analysis and weighing process under *Evidence Rule* 4 in determining its admissibility.

Thus, for these additional reasons I would reverse the trial court's rulings with respect to these items of evidence.

## III.

The Court also notes defendant's argument that "the State's case was peppered with instances of prosecutorial misconduct." *Ante* at 229, 574 *A.*2d at 968. Because it reverses defendant's conviction and sets aside his sentence on other grounds, the Court declines to "determine whether any conduct of the prosecutor would, standing alone, constitute reversible error." *Ibid.* In my view, there is no question that many of the instances cited by defendant constitute misconduct that warrants reversal.

In addition to contentions that the prosecutor misstated the law and facts, repeatedly attacked the integrity of defense counsel, and relied on a nonstatutory aggravating factor, defendant claims that the prosecutor's use of the terms "I think", "I believe" and "I feel" along with his continual reference to his own thoughts about the evidence constituted reversible error because the prosecutor was improperly inserting his personal

beliefs. The prosecutor's guilt-phase summation reveals the repeated use of the phrases connoting the prosecutor's subjective beliefs. Moreover, defense counsel made a timely objection to the prosecutor's comments immediately following the guilt-phase summation in the form of a motion for a mistrial. *State v. Farrell, supra,* 61 *N.J.* at 106, 293 *A.*2d 176 (defendant's motion for mistrial after summation constituted timely objection and gave the trial judge an opportunity to deliver specific curative instructions). The trial court considered the claimed errors and stated that he would address them in his instructions to the jury, particularly the section pertaining to functions of the court and jury. In his instructions to the jury, given the day after summations the trial court attempted to do so. The curative instructions were patently ineffective. *Id.* at 107, 293 *A.*2d 176 (trial court's general curative instructions that trial counsel's statements were not evidence and should be ignored if not supported by the evidence were not specific and direct enough to cure the prejudice from the prosecutor's comments that by his experience he knew that defendant was guilty).

In a capital-murder case under the more stringent standard of review mandated by *State v. Ramseur,* 106 *N.J.* 123, 324, 524 *A.*2d 188 (1987), this form of prosecutorial misconduct rises to the level of reversible error. The Court should so rule.

## IV.

Defendant argues that the evidence presented in this case does not support the submission of aggravating factor c(4)(c) to the jury. I agree.

In *Ramseur,* we held that aggravating factor c(4)(c) required sufficient evidence of either aggravated battery or torture or of depravity of mind. 106 *N.J.* at 207–09, 524 *A.*2d 188. In this case, the State alleged only depravity of mind at the penalty phase as constituting aggravating factor, c(4)(c).

The *Ramseur* Court defined depravity of mind as follows:

> We conclude that "depravity of mind," however, identifies a concern distinct from that discussed above. These words mark society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose). This term isolates conduct that causes the greatest abhorrence and terror within an ordered society, because citizens cannot either in fact or in perception protect themselves from these random acts of violence. The killer who does it because he likes it, perhaps even because it makes him feel better, who kills bystanders without reason, who kills children and others whose helplessness would indicate that there was no reason to murder, evinces what we define as depravity of mind. [*Id.* at 209, 524 *A.*2d 188 (citations omitted).]

In response to the dissent's criticism that depravity was defined too loosely, the Court restated its understanding of depravity of mind:

> Where the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing, the court shall instruct the jury on the meaning of depravity in this specific context. For the defendant who killed for the enjoyment of it, because the victim just happened to be in the area, or for no reason at all, just to kill, society must be able to reserve its most extreme sanction. [*Id.* at 211, 524 *A.*2d 188.]

Our decision in *Ramseur* directs us to focus on the defendant's state of mind in interpreting the standard of depravity. Critical to that determination is whether defendant had any reason or purpose to kill. A proper construction of c(4)(c) should not allow depravity of mind to be proven by slight evidence supporting a finding of enjoyment of the killing, particularly when there is other evidence that the killing was not purposeless or senseless. *See State v. Matulewicz*, 115 *N.J.* 191, 557 *A.*2d 1001 (1989).

I do not believe that for purposes of establishing depravity—an aggravating factor that can lead to the imposition of the death penalty—the evidence presented in this case supports beyond a reasonable doubt a jury finding that defendant killed without a reason and only or primarily for the pleasure of it. The testimony established that defendant ran after the victim shooting at him as he ran down the street. After wounding him, defendant walked to where he crawled and fired three more shots at close range killing the victim. A witness testified that he heard "yahoo" come from the scene of the shoot-

ing; another witness heard a "yelp" at that time. The "yahoo" or "yelp" testimony is the only support for the State's argument that defendant killed his victim because he enjoyed it and wanted only to kill for pleasure. Further, this evidence does not at all support the finding that there was no reason for the killing. Because the helplessness of a victim does not by itself establish depravity but rather may suggest "the senselessness of the killing," *id.* at 207 n. 36, 557 *A.*2d 1001, it is important to stress that the killing in this case was not a random act of violence. Defendant's relationship with the victim's wife provided a strong reason for his actions and puts it within the class of murders that are "the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder." *Id.* at 211, 557 *A.*2d 1001.

Thus, giving all favorable inferences to the State, the evidence cannot support a jury finding beyond a reasonable doubt that the killing was committed "without purpose or meaning" and only for pleasure. I would rule in this case that the evidence was insufficient to establish aggravating factor c(4)(c) and would not permit its resubmission in any retrial of this matter.

## V.

For these additional reasons, I concur in the judgment of the Court, and dissent from parts of its opinion.

STEIN, J., concurring in part and dissenting in part.

I join the Court's opinion in all respects other than its determination that the trial court's failure to have instructed the jury in the manner required by *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), constitutes reversible error. *Ante* at 212, 574 *A.*2d at 960. We held in *Gerald* that under our state constitution, one who takes the life of another with "an intent to inflict only serious bodily injury with no intention that death be the result" cannot be subjected to the death penalty. 113

*N.J.* at 89, 549 *A.*2d 792. Not having the benefit of our decision in *Gerald,* the trial court did not distinguish in its charge on purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1) and (2), between purposely causing death, and purposely causing only serious bodily injury resulting in death. In convicting defendant of murder, the jury was not instructed to specify for which of the two distinguishable offenses he was convicted, an error the majority concludes is reversible. *Ante* at 211–212, 574 *A.*2d at 960.

I am of the view that our holding in *Gerald* should have limited application in homicide cases in which the killing was committed with a gun fired at close range. Absent specific evidence in the record suggesting that the defendant's intent was limited to the infliction of serious bodily injury only and that death was an unintended consequence, such homicides ordinarily will not fit within the class of serious-bodily-injury murders that we immunized from the death penalty in *Gerald.*

The evidence in this record was adequate to afford a slim but rational basis for the jury to convict defendant of serious-bodily-injury murder. The Code's rational-basis test "imposes a low threshold * * * for permitting a charge on a lesser-included offense." *State v. Crisantos (Arriagas),* 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986).

Defendant's direct testimony that he was not trying to kill Lemberg but rather "to stop him from getting Rhonda" was theoretically consistent with the state of mind described in *Gerald, i.e.,* an intent to cause serious bodily injury but not death. It is evident, however, that portions of defendant's direct testimony were inconsistent with that state of mind:

> To be perfectly honest, I didn't care if he got killed at that point. As far as I was concerned at that point, my objective was to stop him from getting at Rhonda and whatever means available to do that, I was going to use. That's all I was concerned with, and I did it. [*Ante* at 211, 574 *A.*2d at 959.]

Nevertheless, in applying the Code's rational-basis test it is not necessary that all of defendant's evidence support the lesser-included charge, provided that there is minimal but adequate

evidence to permit the jury rationally to return a verdict on the lesser offense. *Crisantos, supra,* 102 *N.J.* at 276, 508 *A.*2d 167. Thus, the jury theoretically could have disbelieved all of the State's evidence and so much of defendant's evidence not consistent with serious-bodily-injury murder, crediting only those portions of defendant's testimony that reflected an intent to injure but not kill. On that assumption, the record would have been minimally adequate to support a charge on serious-bodily-injury murder.

As we acknowledged in *Gerald,* however, the evidence in some capital-murder cases is so compelling that there could be "no question that [the defendant] intended the death of his victim." 113 *N.J.* at 79–80, 549 *A.*2d 792 (citing *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), and *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987)). The decisive issue is whether the omission of an instruction on serious-bodily-injury murder was "clearly capable of affecting * * * the verdict * * *." *See State v. Bey,* 112 *N.J.* 45, 94, 548 *A.*2d 846 (1988).

The Court's opinion carefully describes the critical events. In the course of a heated argument with his wife, provoked at least in part by her relationship with defendant, Lemberg began to chase her down the street. Defendant followed him, opening fire with his nine-millimeter handgun from a distance of about twenty feet. Although defendant's first shots missed, another round hit Lemberg in the leg. Lemberg crawled across the adjacent front lawn and hid behind a spruce tree. Defendant followed, and fired three more rounds. Two shots hit the victim: one bullet struck him in the shoulder, fired from a distance of twelve to twenty-eight inches; another bullet struck Lemberg in the back of the head and, according to the medical examiner, was immediately fatal. Defendant conceded that only "a couple of feet" separated the gun from the victim when he fired the final shots.

Questioned specifically at trial about the events after Lemberg was shot in the leg, defendant testified that Lemberg started to "launch back off the ground" after he was wounded. Defendant testified further as to his state of mind:

A. * * * Everything that I had tried didn't work, and I couldn't take anymore chances at that point.

Q. *Were you firing to kill him?*

A. *No.*

Q. *Why were you shooting?*

A. *To stop him.*

Q. *To stop him from what?*

A. *To stop him from getting Rhonda.*

(Emphasis added.)

Although admitting that he "didn't care if [Lemberg] got killed at that point," defendant insisted that he "wasn't trying to kill him," but "was just trying to stop him."

Notwithstanding defendant's insistence that his purpose was merely "to stop" Lemberg, it is virtually inconceivable on this record that a jury would conclude that defendant intended "to inflict only serious bodily injury with no intention that death be the result * * *." *Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792. The victim had fallen to the ground from the bullet wound in the leg, and had crawled behind a tree to escape from defendant. From extremely close range—two feet or so according to both defendant and the medical examiner—defendant fired three more rounds, striking Lemberg in the back of the shoulder and the back of the head. Death was instantaneous. As we observed in *State v. Breakiron,* 108 *N.J.* 591, 605–06, 532 *A.*2d 199 (1987): "[O]ne who shoots the bullet into the head of another will be hard put to convince a jury that he or she did not know, with practical certainty, that death would result."

For this jury to have returned a verdict of serious-bodily-injury murder, it would have had to conclude that defendant's "conscious object" was to cause only serious bodily injury but not death, or that defendant was "practically certain" that only serious bodily injury but not death would result. *See N.J.S.A.* 2C:2–2b(1) and (2) (defining "purposely" and "knowingly").

The risk of death from firing a nine-millimeter handgun at close range, aimed at or near the head of a victim, is so great as to be virtually irreconcilable with an intent to inflict only serious bodily injury and not death.

As noted, we explained in *Gerald* that our state constitution precludes the imposition of the death penalty on "those who act with a less culpable state of mind, *i.e.,* an intent to inflict only serious bodily injury with no intention that death be the result." 113 *N.J.* at 89, 549 *A.*2d 792. We have not specifically applied *Gerald* to a defendant who shoots and kills a victim at close range, intending *either* death *or* serious bodily injury. As I read *Gerald,* such a defendant remains subject to the death penalty.

I am fully satisfied that the trial court's omission of the *Gerald* charge was not capable of affecting the jury's verdict. Charged in accordance with *Gerald,* the jury could not conceivably have determined on this record that defendant intended to cause Lemberg only serious bodily injury and not death. *See State v. Pitts,* 116 *N.J.* 580, 614–20, 562 *A.*2d 1320 (1989).

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN and GARIBALDI—5.

*Concurring in part; dissenting in part*—Justices HANDLER and STEIN—2.