**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0899-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JONATHAN L. SYLVESTER,
a/k/a BJ SYLVESTER, JOHN
SYLVESTER, JONATHAN J.
SYLVESTER, JOHNATHAN
L. SYLVESTER, and JOHNATHAN
L. SYLVESTER, JR.,

    Defendant-Appellant.

_____

Submitted September 18, 2019 – Decided October 16, 2019

Before Judges Fuentes, Haas and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-01-0001.

Joseph E. Krakora, Public Defender, attorney for appellant (Susan Brody, Assistant Deputy Public Defender, of counsel and on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Special

Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant appeals from a September 28, 2017 judgment of conviction for murder and weapons charges. We affirm.

Defendant was charged with first-degree murder, N.J.S.A. 2C:11-3(a) (count one); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three). After fourteen days of trial testimony, the jury convicted defendant on all three counts.

At sentencing, the trial judge merged counts one and three, and sentenced defendant to life in prison with a thirty-year parole ineligibility period. On count two, the judge sentenced defendant to a concurrent ten-year term with a five-year period of parole ineligibility. One month later, the judge resentenced defendant on count one, in accordance with the No Early Release Act, N.J.S.A. 2C:43-7.2, to life imprisonment with an eighty-five percent parole disqualifier.

I.

Defendant allegedly shot and killed Rashawn Bryant (the victim) after the two argued over a dice game. The Plainfield police responded to the scene of

the shooting and interviewed several individuals. The police found spent shell casings, but did not recover a weapon. Nor did the police find clothing that matched the items worn by the shooter.

At trial, the following witnesses testified on behalf of the State: Mitchell Britton, Anthony Broy, Alex Greene, Dorrell Henderson, Fatimah Noel, and Kenneth Williams. Britton, Henderson, and Williams were playing dice in the street outside defendant's house at the time of the shooting. Henderson is defendant's cousin. Noel was defendant's then-girlfriend. Broy was in the area when the shooting occurred but did not play dice with the group. Greene lived with defendant.

Britton, Henderson, and Williams had varying accounts of the incident. They said defendant wanted to join the game but was told he could not play. Defendant then walked away, but stated he would return.

Greene, who was on the porch of defendant's house, heard an argument between defendant and the victim. Greene testified defendant appeared upset when he returned to the house. According to Greene, defendant went upstairs. When defendant returned, he was wearing something black over his head.

Britton, Henderson, and Williams originally told the investigating officers there had been a drive-by shooting from a black vehicle that fled the scene. The

A-0899-17T1

police obtained surveillance video of the street at the time of the shooting. No black car was in the area at the time of the shooting. As a result of the contradictory surveillance video, the police brought Britton, Henderson, and Williams to the police station for follow-up interviews.

The police again questioned the men regarding the shooting. All three confessed there was no drive-by shooting. They explained they made up the story because they did not want to get involved, distrusted the police, and sought to avoid being charged in connection with the shooting.

At the police station, the men described a masked man who approached the dice game, displayed a gun, and fired three or four shots. Britton told the police it was possible defendant was the shooter because defendant left the game and said he would return. Williams stated the shooter wore a ski mask, jeans, and a hoodie. Henderson's version of the events was similar to the accounts provided by Britton and Williams.

In his original statement, Greene, who was standing on the porch of the house where he and defendant resided, told the police he heard gunshots and saw defendant running and pulling a ski mask over his face.

Britton called 9-1-1 and the victim was taken to the hospital, where he died as a result of a gunshot wound to the abdomen.

A-0899-17T1

Noel, defendant's girlfriend at the time, went to defendant's house shortly after the shooting. She asked defendant if he had anything to do with the shooting. According to Noel, defendant responded, "Baby, I love you and I'm sorry." However, he told Noel he had nothing to do with the shooting.

At trial, Britton, Greene, Henderson, and Williams were unable to recall the events of the evening. They also did not remember their recorded statements to the police. The prosecution used transcripts from the police interviews to refresh the witnesses' recollections during their trial testimony.

Britton testified defendant was wearing a white tank top, shorts, and boots when he approached the group. Britton stated the victim and defendant did not argue that evening. He said the shooter wore a ski mask and black hoodie and appeared from a backyard located across the street from the dice game.

According to Williams, defendant approached the dice group and wanted to join the game. Williams testified that defendant wore a tank top, shorts, and boots. He was unable to remember whether defendant and the victim argued over the dice game. However, during his interview with the police, Williams stated defendant and the victim argued. Williams also told the police the shooter was a tall black man wearing a ski mask, a royal blue hoodie, and gloves, and the shooter and defendant were similar in height. According to Williams's trial

A-0899-17T1

testimony, the shooter came from the opposite side of the street from a rear yard, but he was unable to recall the specific yard.

Henderson gave testimony similar to the accounts provided by Britton and Williams. In his police interview, Henderson recalled defendant being unhappy that he was not allowed to join the dice game. According to Henderson, defendant left the game but said he would be back. Henderson "presumed" defendant was the masked man who approached the group, pulled out a gun, and fired three or four shots.

Kareem Duren testified for the State. At the time of his testimony, Duren was serving a seven-year prison sentence. He was in the same prison and cell block as defendant. According to Duren, while playing cards with defendant and other inmates in the prison, the group discussed people they knew in Plainfield and the victim's name was mentioned. Defendant allegedly discussed the shooting and said, "Yeah, I bust his ass."

Duren wrote to the prosecutor's office regarding defendant's jailhouse confession several months later. Duren admitted he did so hoping to receive leniency on his sentence and get "a deal." Duren told the jury he did not receive a deal for providing information about defendant's confession to law enforcement.

6

On cross-examination, Duren testified he was not given a photograph of defendant to properly identify the individual who confessed to shooting the victim. Defense counsel also established Duren regularly provided information to detectives and prosecutors in an attempt to gain an earlier release from prison.

Koctrell Battle, who was in the same prison and cell block at the same time as defendant and Duren, was the only defense witness to testify at trial. His testimony starkly contrasted Duren's testimony. Battle recalled the card game when defendant supposedly confessed to killing the victim. However, Battle said the card group was joking around while they played and testified defendant never mentioned the victim's name or confessed to shooting the victim.

Defense counsel asked Battle whether being an informant potentially benefits an inmate. Battle explained inmates become informants to "get stuff like their charges thrown out or time off their sentence . . . ." He further testified an inmate could learn about another inmate's case through gossip with other prisoners, and it was possible for inmates to look at case files maintained within the prison.

At the conclusion of testimony, counsel presented closing arguments. Defense counsel attacked the credibility of the witnesses. In his summation, he pointed to flaws in the police investigation of the shooting. Defense counsel

A-0899-17T1

told the jury the testimony of Britton, Greene, Henderson, and Williams should be discredited because they were liars who could not be trusted. Counsel characterized Duren as a "jailhouse snitch" who testified to further his self-interest. Defense counsel also attacked the lead investigating detective, listing numerous mistakes and highlighting his inexperience.

The State's summation focused on the reluctance of the witnesses who testified at trial and their inability to recall the shooting. The assistant prosecutor explained the eyewitnesses were reluctant to testify because they feared being charged in connection with the shooting and hesitated to cooperate with the police based on previous negative experiences with the criminal justice system. She told the jury reluctant witnesses are "still credible" because they "ultimately disclosed the truth."

In response to defense counsel's attack of the lead investigative detective during summation, the State described the investigation as "thorough" and told the jury the investigators "tirelessly work[ed] this case." The assistant prosecutor informed the jury the investigator "spent time away from his own family . . . day after day working this case along with the other team of investigators. Because [he] cared about doing the right thing . . . ."

A-0899-17T1

The assistant prosecutor cited the poet Maya Angelou, and compared the victim's death to hers. She contrasted Maya Angelou's honesty and "raw" writing style to the witnesses' silence and lies. She then asked the jury to "[u]se [their] voice and find this defendant guilty as charged . . . ."

After the closing arguments, the trial judge charged the jury in accordance with the model jury instructions. During deliberations, the jury asked the judge to provide a "more layperson/basic distinction" between murder, aggravated manslaughter, and reckless manslaughter. Initially, the judge indicated he would give the jury more basic definitions. However, the next morning, the judge instructed the jury to refer to the verdict sheet and consider the charges sequentially.

Defense counsel asked the judge to reinstruct the jury using the model jury charge, specifically the "presumption of innocence, burden of proof and reasonable doubt after listening to that simplified version of murder versus agg[ravated] man[slaughter] versus manslaughter." The judge declined to reinstruct the jury.

Later that day, the jury rendered its verdict, finding defendant guilty on all counts.

A-0899-17T1

At sentencing, the judge found aggravating factors one, two, three, six, and nine of N.J.S.A. 2C:44-1(a) applied. He found no mitigating factors applied. The judge also reviewed defendant's criminal history and prior prison sentences. After the judge merged counts one and three, he sentenced defendant to life imprisonment with an eighty-five percent parole disqualifier. On count two, the judge sentenced defendant to a concurrent ten-year term with a five-year period of parole ineligibility.

## II.

In his counseled brief on appeal, defendant raises the following arguments:

Point I

> THE COURT'S REFUSAL TO RESPOND TO THE JURY'S INQUIRY BY REINSTRUCTING AS TO THE ELEMENTS OF MURDER AND ITS LESSER INCLUDED OFFENSES, AND ITS DECISION TO INSTEAD MERELY INSTRUCT THE JURORS TO CONSIDER THE CHARGES SEQUENTIALLY, DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

Point II

> THE IMPROPER INTRODUCTION OF TRIAL TESTIMONY FORENSICALLY LINKING THE MISSING FIREARM ALLEGEDLY USED IN THE OFFENSE TO A PRIOR, UNRELATED CRIME

10

DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL (NOT RAISED BELOW).

Point III

THE INTRODUCTION AT TRIAL OF INHERENTLY UNRELIABLE JAILHOUSE INFORMANT TESTIMONY WAS INCOMPATIBLE WITH THE DUE PROCESS RIGHTS GUARANTEED TO DEFENDANT UNDER THE NEW JERSEY CONSTITUTION, AND THUS, REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. IN THE ALTERNATIVE, REVERSAL IS REQUIRED BECAUSE THE COURT FAILED TO HOLD A PRETRIAL HEARING ON THE RELIABILITY OF THE TESTIMONY AND FAILED TO PROPERLY INSTRUCT THE JURY ON HOW TO EVALUATE SUCH TESTIMONY (NOT RAISED BELOW).

Point IV

THE COURT ERRED TO DEFENDANT'S GRAVE DETRIMENT IN PERMITTING THE PROSECUTOR TO PLAY, OUT OF CONTEXT AND OVER DEFENSE OBJECTION, AN AUDIO AND VIDEO EXCERPT OF THE MOST DAMAGING PORTION OF ALEX GREENE'S STATEMENT TO POLICE.

Point V

THE PROSECUTOR'S MULTIPLE INSTANCES OF PROFESSIONAL MISCONDUCT THROUGHOUT THE TRIAL HAD THE INEVITABLE EFFECT OF DEPRIVING DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO HAVE HIS CASE CONSIDERED BY A FAIR AND IMPARTIAL JURY. REVERSAL IS REQUIRED (NOT RAISED BELOW).

11

Point VI

> THE LIFE TERM IMPOSED UPON DEFENDANT IS SO MANIFESTLY EXCESSIVE UNDER ALL THE APPLICABLE CIRCUMSTANCES THAT IT MUST SHOCK THE CONSCIENCE OF THE THIS COURT. IT SHOULD BE VACATED AND THE MATTER REMANDED FOR RESENTENCING (NOT RAISED BELOW).

In his supplemental pro se brief, defendant asserts the following arguments:

Point I:

> THE TRIAL COURT[']S RESPONSE TO THE JURY[']S QUESTION OF A MORE "LAY PERSON" "BASIC DISTINCTION" OF THE CHARGE OF MURDER AND THE LESSER INCLUDED OFFENSE OF AGGR[A]VATED MANSLAUGHTER AND RECKLESS MANSLAUGHTER WAS ERROR AND THE STATE[']S ARGUMENT IS INAPPROPRIATE.

Point II

> THE STATE[']S RESPONSE TO WHETHER THE COURT PROPERLY PERMITTED THE STATE TO PLAY A PORTION OF ALEX GREENE[']S STATEMENT TO THE POLICE [SIC] NOR WAS IT APPROPRIATE TO REPLAY IT AT THE JURY[']S REQUEST WITHOUT PUTTING THE REPLAY IN PROPER CONTEXT.

## III.

We note defendant raises several arguments in his counseled brief for the first time on appeal. As the Supreme Court explained, "[a]ppellate review is not limitless." State v. Robinson, 200 N.J. 1, 19 (2009). It is well-established that "our Rules envision the making of contemporaneous objections as the principal and almost exclusive means of preserving an issue for appeal." Id. at 20 (citing R. 1:7-2).

In addition, defendant did not object at trial to the State's introduction of ballistic testimony; the testimony of the jailhouse informant; or the instances of prosecutorial error. Therefore, we consider these issues under the plain error standard, that is, whether the error was "of such a nature as to have been clearly capable of producing an unjust result . . . ." R. 2:10-2. Not any possibility of an unjust result will suffice as plain error, only one "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

Applying these legal principles, none of the alleged errors were clearly capable of producing an unjust result.

A-0899-17T1

IV.

We first consider whether the trial court erred in responding to the jury's request for supplemental definitions of murder, aggravated manslaughter, and reckless manslaughter. Defendant contends the judge should have provided additional information to the jury in response to their question and recharged the jury using the model jury charges.

When a jury requests a clarification from a trial court, the judge is obligated to "clear the confusion." State v. Savage, 172 N.J. 374, 394 (2002) (quoting State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984)). The court must "guide the jury, which includes responding to any questions it may ask during deliberations." State v. Marcus, 294 N.J. Super. 267, 292 (App. Div. 1996). The trial judge must instruct the jury on the law clearly and accurately. State v. Oates, 246 N.J. Super. 261, 268 (App. Div. 1991).

When charging a jury on murder, manslaughter, and reckless manslaughter, "there is nothing inherently wrong with a sequential charge." State v. Perry, 124 N.J. 128, 164 (1991) (quoting State v. Coyle, 119 N.J. 194, 223 (1990)). In Perry, the trial judge instructed the jury to deliberate on "murder[ first], and to move on to subsequent charges only if the jury acquitted defendant of murder[ first]." Ibid. In affirming the trial judge's instruction, the

Court noted "sequential charges usually provide a framework for orderly deliberations." Id. at 165 (quoting Coyle, 119 N.J. at 223).

Here, the judge gave the model jury instructions to the jury regarding murder, aggravated manslaughter, and reckless manslaughter. Defendant did not argue the instructions provided to the jury were erroneous.

During deliberations, the jury asked the trial court to provide a "layperson/basic" definition for murder, aggravated manslaughter, and reckless manslaughter. The judge told the jury to "[d]eal with issue one[, murder,] first, resolve it, and then move on to the next. And then[,] after you've dealt with count one and the lesser included charges, you can move on to the remaining counts . . . ." The judge reminded the jurors they had a written copy of the jury charge and should review it for the elements of the offenses. In addition, the judge instructed the jury to return with any additional questions if they needed further clarification.

The jury then continued deliberating without asking any additional questions before reaching a verdict. "The failure of the jury to ask for further clarification or indicate confusion demonstrates that the response was satisfactory." State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991).

We are satisfied there was no error in the charge as given. The judge provided the jury with the model jury instructions and there is a presumption the jury followed his charge. See Savage, 172 N.J. at 394. The jury charge and the judge's response to the jury's question, taken as a whole, did not prejudice defendant or confuse the jury. Id. at 387.

V.

We next review defendant's contention that the trial judge erred in admitting testimony offered by the State, linking the gun allegedly used by defendant to a crime committed several months earlier. Based on a pre-trial agreement between counsel and the trial court's consent to admission of the State's ballistics testimony, we reject defendant's contention.

The assistant prosecutor, recognizing the testimony might be prejudicial to defendant, expressed her concern to the judge and defense counsel. Defense counsel replied he had no concern and intended to use the evidence to defendant's advantage during the trial.

When defense counsel acquiesces to a "mistake" or "error" at trial, such as the introduction of otherwise inadmissible evidence, that mistake is generally no longer a basis on appeal. State v. A.R., 213 N.J. 542, 561 (2013). "[I]f a party has 'invited' the error, he is barred from raising an objection for the first

16

time on appeal." Ibid. The invited error doctrine disqualifies trial errors that defense counsel "induced, encouraged or acquiesced in or consented to" as grounds for reversal. State v. Munafo, 222 N.J. 480, 487 (2015) (quoting A.R., 213 N.J. at 561). "The invited-error doctrine is intended to 'prevent defendants from manipulating the system' and will apply 'when a defendant in some way has led the court into error' while pursuing a tactical advantage that does not work as planned." State v. Williams, 219 N.J. 89, 100 (2014) (quoting A.R., 213 N.J. at 561-62). The doctrine will not apply if the error "cut[s] mortally into the substantive rights of the defendant," State v. Corsaro, 107 N.J. 339, 345 (1987) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)), or if applying it would "cause a fundamental miscarriage of justice." A.R., 213 N.J. at 562 (quoting N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010)).

Here, defense counsel consented to admission of testimony that the gun used to kill the victim had been used in a prior shooting. Counsel made a strategic decision to use potentially damaging evidence to defendant's advantage at trial. Through cross-examination of the State's ballistics witness, defense counsel informed the jury that the gun in this case was never recovered and the

victim in the prior incident was unable to identify the shooter, casting doubt on defendant's identity as the shooter.

Having reviewed the record, we discern no abuse of discretion in the judge's admission of the ballistics testimony because defense counsel consented to the testimony for strategic reasons.  See State v. Marshall, 123 N.J. 1, 93 (1991) ("except in the most extreme cases, strategic decisions made by defense counsel will not present grounds for reversal on appeal").  We are satisfied there was "no fundamental injustice that would warrant relaxing the invited error doctrine."  See M.C. III, 201 N.J. at 342.

## VI.

We next address defendant's challenge to the judge's admission of testimony from a jailhouse informant.  Defendant argues the testimony of the jailhouse informant should have been precluded as unreliable.  Alternatively, defendant contends the judge should have conducted a pretrial hearing to determine the reliability of the informant's testimony.  At a minimum, defendant asserts the judge should have provided the jury with the cooperating witness charge.

Defendant's argument is premised on various law review articles and out-of-state cases that are not binding on this court.  Relying on these materials,

18                                                                                    A-0899-17T1

defendant argues jailhouse informants falsely testify to gain favor with law enforcement and receive favorable treatment in return for their testimony.

Defendant essentially challenges the credibility of the jailhouse informant's testimony. Issues of credibility are to be decided by the jury. State v. Frisby, 174 N.J. 583, 594 (2002) (quoting State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991)). "[T]he jury is charged with making credibility determinations based on ordinary experiences of life and common knowledge about human nature, as well as upon observations of the demeanor and character of the witness." State v. Jamerson, 153 N.J. 318, 341 (1998) (citing J.Q., 252 N.J. Super. at 39). In assessing credibility, "[c]ross-examination is 'the "greatest legal engine ever invented for the discovery of truth."'" State v. Silva, 131 N.J. 438, 444 (1993) (quoting California v. Green, 399 U.S. 149, 158 (1970)).

We are satisfied defendant's counsel thoroughly cross-examined the jailhouse informant, Duren, regarding defendant's confession. Counsel elicited testimony regarding Duren's prior convictions, resulting prison sentences, and motivation for testifying, including a desire to receive favorable treatment in return for testifying against defendant. In addition, the sole defense witness, fellow inmate Battle, testified defendant never confessed to killing the victim. The judge properly charged the jury in assessing the credibility of witnesses.

19

Based on these considerations, we are satisfied defendant's due process rights were not violated. Therefore, the admission of testimony from the jailhouse informant was not an error "clearly capable of producing an unjust result." R. 2:10-2. We also note defendant never requested a cooperating witness charge and the issue was raised for the first time on appeal.

VII.

We next consider defendant's argument that the court erred in playing an excerpt of Greene's videotaped statement to the police during the trial. In the portion played for the jury, Greene stated defendant went from his house to the street; Greene then heard shots; and Greene saw defendant running to the back of the house wearing a ski mask. At trial, Greene testified he was unable to recollect his statement to the police, except to recall crying during the police interview, and claimed he was pressured by the police to provide untrue facts.

When reviewing a trial court's decision to admit evidence, we are "limited to examining the decision for abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (quoting Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)). Under the abuse of discretion standard, "an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling 'was so wide of the mark that a manifest denial of justice resulted.'" Id. at 385-86 (quoting State

v. Marrero, 148 N.J. 469, 484 (1997)).  "Considerable latitude is afforded a trial court in determining whether to admit evidence . . . ."  State v. Feaster, 156 N.J. 1, 82 (1998).

N.J.R.E. 803(c)(5) allows a party to read a past recorded recollection when the witness does not remember the circumstances of what occurred or his or her previous testimony.  See State v. Cestone, 38 N.J. Super. 139, 146 (App. Div. 1955).  In addition, N.J.R.E. 607 allows extrinsic credibility evidence to be introduced by any party.  See State v. Parker, 216 N.J. 408, 418 (2014).

Having reviewed the record, the judge did not abuse his discretion in admitting a portion of Greene's videotaped statement to the police.  Greene's recorded statement met the requirements of N.J.R.E. 803(c)(5).  The recording was made shortly after the shooting and concerned a matter that Greene recalled at the time he gave his statement but did not remember at the time of trial.

In addition, the admissibility of the videotaped interview was governed by N.J.R.E. 607, which allows admission of extrinsic evidence relevant to credibility.  Greene told the jury he cried during his recorded statement and was pressured into giving the statement to the police.  The State sought to challenge his credibility.

The State asked the judge to allow the jury to see and hear the videotape of Greene's recorded statement, arguing it was admissible to show Greene did not cry during the interview, the police did not pressure Greene during questioning, and Greene was "cool, calm and collected" throughout the interview.

Defense counsel objected, arguing the video was inadmissible under the Rules of Evidence, the recorded testimony was "riddled with hearsay," and contained information the "jury should not be hearing."

The judge admitted the video for impeachment of Greene's testimony under N.J.R.E. 803(c)(5), N.J.R.E. 607, and general relevancy grounds. He found the video would show the jury that Greene was "cool, calm and collected" during the police interview. The judge also permitted the State to play the audio from that portion of the police interview for the jury to determine if Greene spoke in a manner consistent with someone who was distraught and pressured into answering the officers' questions.

We discern no abuse of discretion in allowing the State to use the videotape of Greene's police interview, inclusive of the audio, as probative in challenging Greene's credibility at trial. The jury was able to consider the videotape to gauge Greene's demeanor during the interview, measure the

22

officers' tone and manner during their questioning, and assess Greene's credibility. Under the circumstances, the use of Greene's videotape statement to the police was not an error "clearly capable of producing an unjust result." R. 2:10-2.

## VIII.

Defendant next argues multiple instances of prosecutorial error during the course of the trial warrant reversal of his conviction and a new trial. Defendant alleges the following examples of error by the State: the assistant prosecutor's attacking Britton during direct-examination; insinuating "Britton, Henderson, and Williams had lied to police at first because they were afraid of being labeled snitches;" bolstering the investigators' credibility during summation; using the word "maniac" to describe the shooter; and relating the victim to Maya Angelou during closing argument.

A reviewing court should not reverse a conviction on the grounds of prosecutorial error "unless the conduct was so egregious as to deprive defendant of a fair trial." State v. Wakefield, 190 N.J. 397, 437-38 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). To warrant a new trial, the prosecutor's misconduct must be "clearly and unmistakably improper" and "substantially prejudice[] defendant's fundamental right to have a jury fairly

evaluate the merits of his defense." Id. at 438 (citing State v. Smith, 167 N.J. 158, 181-82 (2001)). "Factors to consider when analyzing prosecutorial conduct include whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court gave a limiting instruction." State v. Chew, 150 N.J. 30, 84 (1997).

Here, defendant's counsel did not object to the assistant prosecutor's remarks when they were made. "[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)). A "[d]efendant's lack of objections . . . weighs against [the] defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (second and third alterations in original) (quoting Macon, 57 N.J. at 333).

Prosecutors have "considerable leeway in summing up the State's case." State v. W.L., 292 N.J. Super. 100, 110 (App. Div. 1996) (citing State v. Williams, 113 N.J. 393, 447 (1984)). Prosecutors' comments "must be confined to the evidence and the reasonable inferences to be drawn from the evidence."

Id. at 111 (citations omitted). Remarks "plainly designed to impassion the jury" are often grounds for reversal. Ibid. (quoting State v. Gregg, 278 N.J. Super. 182, 191 (App. Div. 1994)).

Generally, it is inappropriate for a prosecutor to comment on the credibility of the police officers who testify at trial. See State v. Hawk, 327 N.J. Super. 276, 284-85 (App. Div. 2000); State v. Frost, 158 N.J. 76, 85-86 (1999). However, a prosecutor's otherwise prejudicial arguments may be harmless if made in response to defense counsel's arguments. See State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001); State v. DiPaglia, 64 N.J. 288, 297 (1974).

The remarks to which defense counsel objected were withdrawn by the State. As to other conduct or questions by the State that defendant claims were improper, defense counsel failed to object at trial. In reviewing the transcript of the closing argument, we note the assistant prosecutor's statements, specifically regarding the police officers' conduct and the reluctance of the witnesses to testify, were in response to arguments asserted in defense counsel's closing or were based on the evidence in the record.

With regard to the reference to Maya Angelou during the State's closing argument, prosecutors "are expected to make vigorous and forceful closing arguments to juries." Frost, 158 N.J. at 82. Because defense counsel failed to

object to this portion of the State's summation, we are satisfied counsel was not concerned with this remark at the time of closing.

While some remarks by the assistant prosecutor during the course of trial were bordering on improper, they did not "substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Wakefield, 190 N.J. at 438 (quoting Papasavvas, 163 N.J. at 625). After a careful review of the record, it is clear the assistant prosecutor's statements and conduct during the trial were either fair comments or harmless, and there is no indication that the jury was led to a result it would not have otherwise reached. We therefore reject defendant's contention that the assistant prosecutor's conduct deprived him of a fair trial.

IX.

Defendant argues the life sentence imposed is manifestly excessive and shocks the conscience. He also argues the judge engaged in "double-counting" by relying on the seriousness of the crime in finding aggravating factors one and two.

We review the trial court's sentencing decision under an abuse of discretion standard. State v. Jones, 232 N.J. 308, 318 (2018). In doing so, we consider whether: "(1) the sentencing guidelines were violated; (2) the findings

26

of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record'; [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Here, the judge found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense); two, N.J.S.A. 2C:44-1(a)(2) (gravity and seriousness of the harm); three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); six, N.J.S.A. 2C:44-1(a)(6) (prior criminal record); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter). The judge found no mitigating factors.

Regarding aggravating factor one, the judge stated "there could be nothing more heinous, cruel or depraved than taking another person's life." The judge explained killing someone who was considered a friend could be one of the worst criminal acts. He added that "shooting someone over something that happened at a dice game or feeling that they were disrespected . . . has to be considered heinous and cruel . . . and depraved."

Regarding aggravating factor two, the judge stated that defendant's intention to murder the victim showed the seriousness of the crime. The judge remarked "[t]he gravity and seriousness of harm inflicted has to specifically be

27

the fact that it was . . . a murder.  It was intended to be a murder. It was done . . . to inflict the maximum amount of harm against the victim."

Regarding aggravating factors three and six, the judge reviewed the presentence report and defendant's criminal record.  Based on that review, the judge concluded there was a risk of reoffending and defendant had a "total disregard for the rules of society . . . ."

Regarding aggravating factor nine, the judge concluded "[t]here's always the need to deter an individual from violating the law and others as well."

Having reviewed the record, we reject defendant's argument that the judge erred in imposing a life sentence because he misapplied the aggravating sentencing factors under N.J.S.A. 2C:44-1(a) by "double-counting" the murder conviction.  The judge provided a statement of reasons supporting his sentencing decision, the sentence is based on competent credible evidence in the record, and it does not shock the judicial conscience.  The trial court applied the aggravating and mitigating factors and followed the appropriate sentencing guidelines.  State v. Bieniek, 200 N.J. 601, 608 (2010) (quoting Roth, 95 N.J. at 364-65).  Defendant's criminal record and the facts of this case support a life sentence.

We have considered defendant's arguments in his pro se supplemental brief and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0899-17T1